1    ACLU FOUNDATION OF SAN DIEGO &
     IMPERIAL COUNTIES
2    DAVID LOY (229235)
     P. O. Box 87131
3    San Diego, CA 92138-7131
     Tel:   (619) 232-2121
4    Fax:   (619) 232-0036

5    MARY KATHRYN KELLEY (170259)
     BLAKE M. ZOLLAR (268913)
6    CRAIG TENBROECK (287848)
     PHILLIP HOOS (288019)
7    COOLEY LLP
     4401 Eastgate Mall
8    San Diego, CA  92121
     Tel:   (858) 550-6000
9    Fax:   (858) 550-6420

10

11   Attorneys for Plaintiff
     Southwest Key Programs, Inc.

12   *Additional counsel on signature page*

13

14            UNITED STATES DISTRICT COURT

15           SOUTHERN DISTRICT OF CALIFORNIA

16

17   SOUTHWEST KEY PROGRAMS,        Case No. **'15CV1115 H     BLM**
     INC.,
18                                  **COMPLAINT FOR (1) VIOLATION OF
                 Plaintiff,         THE FEDERAL FAIR HOUSING ACT,
19                                  (2) VIOLATION OF THE
                                    CALIFORNIA FAIR EMPLOYMENT
20        v.                        AND HOUSING ACT, (3) VIOLATION
                                    OF EQUAL PROTECTION, AND (4)
21   CITY OF ESCONDIDO,             VIOLATION OF THE SUPREMACY
                                    CLAUSE**
22               Defendant.
                                    **JURY TRIAL DEMANDED**
23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO                           1.

1.     Plaintiff Southwest Key Programs, Inc. ("Southwest Key" or "Plaintiff") brings this fair housing action to challenge the City of Escondido's ("Escondido" or "City") discriminatory and unconstitutional obstruction of Southwest Key's good faith efforts to operate an immigrant youth housing facility within the boundaries of Escondido.  Southwest Key seeks declaratory, injunctive, and monetary relief against Escondido for violations of the Federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12927, 12955 *et seq.*; the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and the Supremacy Clause of the United States Constitution.

### INTRODUCTION

2.     The federal government has a statutory duty to provide housing for unaccompanied children fleeing to the United States from countries such as El Salvador, Honduras, and Guatemala, where violence and persecution are endemic. In accord with federal law, Southwest Key contracts with the government to discharge that duty.  Southwest Key already provides such housing at two locations in San Diego County, and it sought to expand its operations to meet increasing demand from the federal government.  A search for available properties identified suitable sites in Escondido, and Southwest Key initiated the process for obtaining necessary permits from the City.  However, the City has engaged and continues to engage in a campaign of obstruction to prevent Southwest Key from providing any housing to unaccompanied children in Escondido by manipulating the land use process, amending the zoning code, and unjustifiably refusing to grant necessary permits.  The City's actions were motivated by discrimination because of race, color, national origin, ancestry, alienage, or immigration status, or hostility to federal policy, or some combination of these factors. The City's actions also have an unjustified disparate impact based on race, color, national origin, or ancestry. As a result, the City has violated federal and state fair housing laws as well as

1  equal protection and federal supremacy principles.  This Court's intervention is
2  necessary to remedy those violations.

3                                            **PARTIES**

4       **3.**     Plaintiff Southwest Key is a nonprofit corporation organized under the
5  laws of the State of Texas with its principal place of business in Texas.  Southwest
6  Key is the largest provider of licensed residential care services for unaccompanied
7  immigrant children in the United States.  The facilities that Southwest Key sought
8  to operate constitute dwellings within the meaning of the Fair Housing Act (FHA),
9  42 U.S.C. § 3602(b), and dwellings or housing accommodations or opportunities
10 within the meaning of the California Fair Employment and Housing Act (FEHA),
11 Government Code §§ 12927, 12955.  Southwest Key is an "aggrieved person" for
12 purposes of 42 U.S.C. § 3613(a)(1)(A) and Government Code § 12927(g).

13      **4.**     Defendant City of Escondido is a municipal corporation, established
14 and organized under the laws of the State of California.  The City of Escondido is a
15 person subject to 42 U.S.C. § 1983, 42 U.S.C. § 3602(d), and Government Code
16 § 12927(f).  At all relevant times described herein, Escondido acted through its
17 agents, officers, and employees.

18                             **JURISDICTION AND VENUE**

19      **5.**     This Court has original jurisdiction pursuant to 42 U.S.C. § 3613 and
20 28 U.S.C. §§ 1331, 1343, because Plaintiff states claims arising under the laws of
21 the United States, specifically the Fair Housing Act, the Equal Protection Clause,
22 and the Supremacy Clause.

23      **6.**     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367
24 to hear and determine Plaintiff's state law claims because those claims are related
25 to Plaintiff's federal law claims and arise out of a common nucleus of related facts.
26 Plaintiff's federal and state law claims form part of the same case or controversy
27 under Article III of the United States Constitution.

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

3.

7.   Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant and its officers are subject to personal jurisdiction within the Southern District of California and because the events which give rise to this action took place within, and the subject properties are located within, the Southern District of California.

## FACTUAL BACKGROUND

A.   **Unaccompanied Children Flee Violence and Persecution in Central America, Presenting A Humanitarian Crisis to Which the Federal Government Must Respond, Given the Unique Legal Status of Unaccompanied Children.**

8.   This case arises against the backdrop of an ongoing humanitarian crisis.  Thousands of unaccompanied children have in recent years sought refuge in the United States, and many such children continue to do so.  The overwhelming majority of these children come from Guatemala, El Salvador, and Honduras.

9.   These children leave their homes and travel north in the hope of gaining entry to the United States, making a perilous journey to escape extreme poverty and widespread gang and drug-related violence in their home countries.

10.   According to the federal government, unaccompanied children "generally leave their home countries to join family already in the United States, [to] escape abuse, persecution or exploitation in the home country, or to seek employment or educational opportunities in the United States." *Fact Sheet*, U.S. Department of Human Services, Administration for Children and Families, Office of Refugee Resettlement, Unaccompanied Alien Children Program at 1 (May 2014) ("Fact Sheet").[1]  Others are "brought into the United States by human trafficking rings." *Id.* at 2.  The age of unaccompanied children, "their separation from parents and relatives, and the hazardous journey they take make them especially vulnerable to human trafficking, exploitation and abuse." *Id.*

---

[1] http://www.acf.hhs.gov/sites/default/files/orr/unaccompanied_childrens_services_fact_sheet.pdf

11.     These overwhelmingly poor, displaced, non-English speaking minors are unable to advocate effectively for themselves.  Most seek to be reunited with parents or relatives already living in the United States.  Although some enter the United States without inspection, others lawfully present themselves at ports of entry to seek asylum or refuge.

12.     Some unaccompanied minors ultimately return to their home countries, but many qualify for immigration relief to remain in the United States.  For example, during the three years ending October 31, 2014, 73 percent of unaccompanied children represented by counsel were allowed to remain in the United States.  Representation for Unaccompanied Children in Immigration Court, TRAC Immigration (Nov. 25, 2014), http://trac.syr.edu/immigration/reports/371/.

13.     Regardless of how they enter the United States, unaccompanied children enjoy significant rights under federal law that are not available to many other immigrants.

14.     Unlike other immigrants, any unaccompanied child who is from a country not contiguous with the United States and is "sought to be removed by the Department of Homeland Security" shall be placed in formal "removal proceedings under section 240 of the Immigration and Nationality Act."  8 U.S.C. § 1232(a)(5)(D)(i).  These "INA 240" proceedings occur before an immigration judge and include the right to retain counsel, present evidence, compel testimony by subpoena, confront and cross-examine witnesses, and pursue appellate review.  See 8 U.S.C. § 1229a.  By contrast, other immigrants can be subjected to summary non-judicial removal through means such as "voluntary return" or "expedited removal," which carry few if any of the rights available in INA 240 proceedings.  See 8 U.S.C. §1229c; 8 U.S.C. § 1225(b)(1)(A).

15.     Unaccompanied children from countries not contiguous with the United States may seek cancellation of removal at no cost, 8 U.S.C.

§ 1232(a)(5)(D)(ii), unlike other immigrants who must pay $100 to seek cancellation.

**16.**    By statute, the government "shall ensure, to the greatest extent practicable," though at no federal expense, that such children "have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking," typically through "pro bono counsel."  8 U.S.C. § 1232(c)(5); *see also* 6 U.S.C. § 279(b)(1)(A) (government must develop plan "to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child").  The government does not generally provide counsel for other immigrants.  8 U.S.C. §§ 1229a(b)(4)(A), 1362; *Acewicz v. INS*, 984 F.2d 1056, 1062 (9th Cir. 1993); *but see Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG DTBX, 2013 WL 3674492, at *3 (C.D. Cal. Apr. 23, 2013) (holding that government must appoint "qualified representatives" in immigration proceedings for "individuals who are not competent to represent themselves by virtue of their mental disabilities").

**17.**    With limited exceptions, "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services."  8 U.S.C. § 1232(b)(1).    Other immigrants are typically detained by Immigration and Customs Enforcement ("ICE"), a component of the Department of Homeland Security, in local jails, private prisons, or its own detention centers.

**18.**    Unless "exceptional circumstances" exist, any federal agency "that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child."    8 U.S.C. § 1232(b)(3).  Any such child "shall be promptly placed in the least restrictive setting that is in the best interest of the child."  8 U.S.C. § 1232(c)(2)(A).

19.    The Office of Refugee Resettlement ("ORR"), a component of the Department of Health and Human Services, must ensure that unaccompanied children are cared for and housed by qualified persons and entities until or unless they can be appropriately placed with relatives or other caregivers pending resolution of their immigration proceedings.    6 U.S.C. § 279(b); 8 U.S.C. § 1232(b).

20.    According to its materials, ORR treats "all children in its custody with dignity, respect and special concern for individual needs" and "strives to provide the highest quality of care tailored to each unaccompanied child in order to maximize opportunities for success both while in care and when discharged from the program." Fact Sheet at 1.

21.    ORR contracts with state-licensed entities to provide housing, education, health, and other services to unaccompanied children.  ORR regularly places unaccompanied children with such entities as the children arrive in the United States and are transferred to ORR custody.  ORR funding covers all direct costs of caring for the children.

**B.    Southwest Key Programs Provide Housing and Other Services for Unaccompanied Children from Central America in Fulfillment of Federal Law and Policy.**

22.    Southwest Key is qualified to provide housing and other services for unaccompanied children.  It is the largest provider of licensed residential services for unaccompanied children in the United States.  It has been providing these services under contract with ORR for more than 17 years.    ORR places unaccompanied children with Southwest Key on an ongoing basis and would place unaccompanied children with Southwest Key in Escondido if the City would allow Southwest Key to open and operate housing for them.

23.    The residents of Southwest Key facilities are almost exclusively Latino children from Central America.  In fiscal year 2014, for example, 95.5% of

children residing in Southwest Key facilities were Latinos from Guatemala, Honduras, and El Salvador.

24.     Southwest Key's mission is to provide residential, educational, health, and other humanitarian services to unaccompanied children in a nurturing environment.  Its programs encourage the development of personal and academic skills and offer an array of services, including case management, legal, medical, dental, educational, vocational, recreational, and religious services.  Southwest Key's resident children do not attend local schools but instead receive instruction where they reside or in special facilities at federal expense.

25.     Children live at Southwest Key facilities until arrangements are made either to reunite them with relatives living in the United States or to place them in appropriate foster care or other living arrangements pending the resolution of immigration proceedings.  While unaccompanied children are living in Southwest Key housing, Southwest Key acts *in loco parentis* as their custodian, with authority to ensure their education and consent to health care on their behalf.

26.     Unaccompanied children live in Southwest Key housing for an average of 27 days, with some residing there for longer periods of time.  According to the federal government, the average length of stay in ORR-funded housing for unaccompanied children is "near 35 days."  Fact Sheet at 2.

27.     For the period of time that children reside in a Southwest Key dwelling, it is their home.  They eat meals and participate in education and recreation together at the Southwest Key dwelling.  They sleep in the same bed and room each night.  They may personalize their rooms and leave their belongings there.  They treat the Southwest Key residence as their home and view it as a place to return to from field trips or other excursions while living there.  While residing in a Southwest Key dwelling, the children have no place else to live.

28.     Southwest Key receives children from ORR only after the government has determined that they "are not likely to pose a danger to themselves or others."

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

8.

6 U.S.C. § 279(b)(2)(A)(iii).  In any event, Southwest Key provides training for its staff on maintaining a safe, secure, and appropriate environment.  Children housed with Southwest Key are constantly and properly supervised during all activities.

29.    Southwest Key's programs are regulated and monitored by federal and state agencies.

30.    Currently, Southwest Key operates 23 state-licensed, residential programs for unaccompanied children in Texas, Arizona, and California.  Two of these facilities are located in San Diego County.  ORR has renewed Southwest Key's contract to operate these San Diego facilities on three separate occasions.

31.    Consistent with long-term trends of increasing migration of unaccompanied children from Central America, Southwest Key sought to open new housing for such children in San Diego County.  After conducting a thorough search that began in early 2014, it determined that suitable properties were located in Escondido.

### C.    The City of Escondido Has a History of Discrimination.

32.    The City of Escondido is one of the largest cities in north San Diego County, approximately 30 miles north of downtown San Diego and less than an hour's drive from the United States-Mexico border.

33.    According to 2010 census data, Escondido has a population of 143,911, 40% white and 49% Latino.  Whites comprise 63% of Escondido residents in congregate living quarters and Latinos only 24%.  With respect to juvenile group homes, the Escondido population is 64% Latino and 27% white.

34.    In the last decade, Escondido's City Council (the "Council") has become associated with discriminatory policies directed at undocumented immigrants.  *See* Anna Gorman, *Undocumented?  Unwelcome*: *Escondido Is Using a Wave of Policies To Try To Drive Away Illegal Immigrants*, L.A. TIMES (July 13, 2008), http://goo.gl/J3pyeD.

35.     Most notably, in 2006, Escondido became the first California city to adopt an ordinance banning landlords from renting to undocumented immigrants ("Rental Ban").   This Court entered a temporary restraining order against the Rental Ban based on "serious concerns" the Ban was unconstitutional, *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1057 (S.D. Cal. 2006), after which the City stipulated to a permanent injunction against its enforcement.

36.     Shortly thereafter, the Council passed a resolution declaring its intent "to address the public nuisances of illegal immigration by aggressively working to prohibit and address acts, policies, people and businesses that aid and abet illegal aliens."

37.     Along with former Councilwoman Marie Waldron, two members of the current City Council voted for the Rental Ban and the above-referenced resolution.   One of them, Ed Gallo, told the Los Angeles Times in 2008 that he regularly receives complaints from Escondido residents about illegal immigrants and said, "If you are not here legally, you don't belong here . . . .   We're talking about image and appearance . . . .   We are trying to change the image of Escondido."   Anna Gorman, *Undocumented?  Unwelcome*: *Escondido Is Using a Wave of Policies To Try To Drive Away Illegal Immigrants*, L.A. TIMES (July 13, 2008), http://goo.gl/J3pyeD.

38.     The other current member of the City Council who voted for the Rental Ban, Sam Abed, is now the Mayor of Escondido.   Mr. Abed has campaigned successfully as a fierce opponent of undocumented immigrants. In 2010, for example, Mr. Abed used a campaign mailer described by one newspaper columnist as an "archaic image of migrants running into oncoming traffic" designed to "turn out (i.e., scare the hell out of) his right-wing base." Logan Jenkins, *Abed's Scare-the-Heck-Out-of-'Em Mailer Actually Could Get Him Elected*, SAN DIEGO UNION-TRIBUNE (Oct. 25, 2010), http://goo.gl/ABh1dz.

39.    When Mr. Abed was asked by a reporter how he knew whether Escondido residents were illegal, he replied, "It's obvious."  Steve Lopez, *Migrant Has Tough Message to Others*, L.A. TIMES (July 20, 2008), http://goo.gl/JHctIq.

40.    As Mr. Abed told the Los Angeles Times in 2008, "We learned from the rental ordinance . . . .  We changed our focus to quality of life issues."  Anna Gorman, *Undocumented?  Unwelcome*: *Escondido Is Using a Wave of Policies To Try To Drive Away Illegal Immigrants*, L.A. TIMES (July 13, 2008), http://goo.gl/J3pyeD.

D.    **The City Erected Roadblocks as Southwest Key Attempted to Navigate the Zoning and Land Use Process.**

41.    The Zoning Code of the City of Escondido (the "Zoning Code"), Chapter 33 of the Escondido Municipal Code ("EMC"), classifies and regulates land uses and structures within the city.  (EMC § 33-3.)   The Zoning Code establishes geographic zones within the City and restricts the nature and intensity of the land uses that may lawfully exist within each zone.  Depending on the zone, certain activities are permitted by right.  In other cases, a Conditional Use Permit ("CUP") is required.  (*See, e.g.* EMC § 33-123 [requiring a CUP for government services and residential care facilities in Residential zones], EMC § 33-332 [requiring the same in Commercial zones].)   According to the Escondido Municipal Code, Escondido's Planning Commission shall grant, conditionally grant, or deny a CUP "based on sound principles of land use" and may impose "conditions necessary and desirable to preserve the public health, safety and general welfare."   (EMC §§ 33-1201, 33-1203.)   The Planning Commission's decision may be appealed to the City Council.  (EMC § 33-1303.)

42.    In or around February 2014, Southwest Key approached the City about using two motels ("Motel Sites") as potential locations to house unaccompanied children.  The Motel Sites were located in the City's General Commercial zone.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1    **43.**    Southwest Key's other dwellings for unaccompanied children in San

2    Diego County are licensed as group homes, which are "residential care facilities"

3    covered by the California Community Care Facilities Act.  Calif. Health & Safety

4    Code § 1501.1(a).  Southwest Key's proposed home for unaccompanied children in

5    Escondido would have been licensed in the same way.

6    **44.**    Southwest Key therefore took the position that its proposed use of the

7    Motel Sites was for the purpose of operating a "residential care facility."  Before

8    August 2014, residential care facilities were entitled to operate as of right in the

9    General Commercial zone.  In other words, Southwest Key would not be required

10   to apply for a CUP to open a residential care facility on the Motel Sites.

11   **45.**    In or around April 2014, after weeks of correspondence between

12   Southwest Key and staff members from Escondido's Planning Division,

13   Escondido's Planning Division staff rejected Southwest Key's proposal.  Staff

14   improperly classified Southwest Key's proposed use as strictly a "shelter," not a

15   "residential care facility."  "Shelters" are prohibited in the zone where the Motel

16   Sites are located.  Instead, a "shelter" may only be located in an Industrial Zone or

17   an Emergency Shelter Overlay.  (EMC §§ 33-564, 33-592.)

18   **46.**    On information and belief, there are no available, suitable locations

19   for Southwest Key to provide housing for unaccompanied children in an Industrial

20   Zone or Emergency Shelter Overlay in Escondido.

21   **47.**    The decision to classify Southwest Key's proposed use as a "shelter"

22   prevented Southwest Key from providing housing to unaccompanied children at

23   the Motel Sites.

24   **48.**    Southwest Key appealed the Planning Division's "shelter" designation

25   to the Escondido Planning Commission, which exercises the power to review land

26   use decisions made by City planning staff.  (EMC § 33-1304.)

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

1    **49.**    The members of the Planning Commission are appointed by the City

2    Council, and any member may be removed by majority vote of the City Council at

3    any time.  (EMC §§ 20-2, 20-5.)

4    **50.**    While its appeal was pending, Southwest Key continued to work with

5    Planning Division staff to identify a site that the City would approve for housing

6    unaccompanied children.  Indeed, Planning Division staff encouraged Southwest

7    Key to look for other sites and suggested the City would work with Southwest Key

8    to consider its proposed use on a different site.  In light of these communications,

9    and hoping to quickly resolve the issue, Southwest Key agreed to suspend the

10   appeal regarding the Motel Sites and work with Planning Division staff to obtain

11   approval for an alternative site.

12   **51.**    Thereafter, while Southwest Key was pursuing the City's approval for

13   an alternative site, the City amended its Zoning Code to preclude residential care

14   facilities as of right in the General Commercial zone.  The amendment allowed the

15   operation of residential care facilities in that zone only with a CUP.  The Planning

16   Commission recommended approval of the amendment on July 22, 2014, and the

17   Escondido City Council approved it on August 6, 2014.

18   **52.**    On information and belief, the City amended its Zoning Code to

19   prevent Southwest Key from providing housing to unaccompanied children on the

20   Motel Sites.

21   **53.**    At the City's suggestion, Southwest Key agreed to seek approval for

22   housing unaccompanied children on the site of a recently shuttered skilled nursing

23   facility, located at 1817 Avenida Del Diablo (the "Project Site").  Although the

24   Project Site fell within a residential zone and would require a CUP, the Planning

25   Commission had in the past approved multiple CUPs that permitted the building's

26   use and expansion as a skilled nursing facility.

27   **54.**    On information and belief, the majority of the residents of the skilled

28   nursing facility that previously operated on the Project Site were white.  According

1    to the 2010 Census, 77% of the individuals who reside in skilled nursing facilities

2    in Escondido are white, and only 15% are Latinos.

3        **55.**    Southwest Key informed the Planning Division that it intended to

4    pursue the Project Site for its new facility.   Given that its designation of

5    "residential care facility" had already been rejected by City officials, Southwest

6    Key suggested a designation of "government services" for its proposed use of the

7    Project Site, because Southwest Key contracts with the federal government to

8    provide housing for unaccompanied children.   "Government services" are

9    permitted in Residential zones with a CUP.  (EMC § 33-123.)

10       **56.**    The Department of Health and Human Services verified to Planning

11   Division staff in writing that Southwest Key was a government contractor and

12   agreed to submit the CUP Application on behalf of Southwest Key to confirm

13   Southwest Key's status as a provider of government services.

14       **57.**    The City accepted Southwest Key's suggestion to treat the proposed

15   use of the Project Site as "government services."   The City has a policy of

16   permitting government services and residential care facilities in residential zones

17   only if a CUP has been issued.  (EMC § 33-123.)

18       **58.**    The City's Zoning Code states "the following guidelines" for deciding

19   a CUP application: "(a) A conditional use permit should be granted upon sound

20   principles of land use and in response to services required by the community; (b) A

21   conditional use permit should not be granted if it will cause deterioration of

22   bordering land uses or create special problems for the area in which it is located[;]

23   (c) A conditional use permit must be considered in relationship to its effect on the

24   community or neighborhood plan for the area in which it is to be located."  (EMC

25   § 33-1203.)  On appeal, the City Council may approve, modify, or disapprove the

26   Planning Commission's decision.  (EMC §§ 33-1205, 33-1303.)

27       **59.**    In or around May 2014, the U.S. Department of Health and Human

28   Services submitted a CUP Application on Southwest Key's behalf to operate

housing for up to 96 unaccompanied children on the Project Site (the "Proposal"). At the same time, Southwest Key secured a five-year lease of the Project Site from the property owner, subject to Escondido's approval of the CUP. The Planning Commission scheduled a hearing on the application for June 24, 2014.

**E.      After Vehement Opposition from City Council Members and the General Public, the Planning Commission Rejected Southwest Key's Application.**

**60.**      City elected officials spoke out repeatedly against Southwest Key's proposal.  Mayor Sam Abed, for example, told the San Diego Union-Tribune before the Planning Commission hearing, "We don't want [the project] in Escondido.   I think it is a federal issue.   President Obama and the Obama administration has failed to resolve the immigration issue and created an environment that put the children at risk."   J. Harry Jones, *Facility for Undocumented Kids Opposed*, SAN DIEGO UNION-TRIBUNE (June 23, 2014), http://goo.gl/uJHvxX.

**61.**      Before the Planning Commission hearing, Mayor Abed said on a local radio show, referring to the proposed Southwest Key facility, "I don't want it anywhere in the City of Escondido.  Let the federal government deal with this issue and take care of it instead of dumping these problems on local governments." *Gov't Sending Unaccompanied Minors to Escondido Shelter*, THE MIKE SLATER SHOW AM 760 KFMB, http://goo.gl/VuXStp.

**62.**      City Councilman Michael Morasco declared on a local radio show before the Planning Commission hearing that the real problem was "the federal philosophy of allowing this type of program to even exist in the first place," and that program "is philosophically in opposition to the citizens of the community." *Gov't Sending Unaccompanied Minors to Escondido Shelter*, THE MIKE SLATER SHOW AM 760 KFMB, http://goo.gl/VuXStp.

**63.**      Escondido's Planning Division staff analyzed Southwest Key's Application and prepared a staff report dated June 24, 2014 ("Commission

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

Report") to assist the Planning Commission's consideration of the application. As the Commission Report stated, "Governmental Services are customarily permitted in residential zones with a Conditional Use Permit when conditioned to meet the underlying zone and related restrictions and when compatible with surrounding properties."

64.   In its report, Planning Division staff did not provide a recommendation to the Planning Commission as to whether it should grant, conditionally grant, or deny the CUP application.   On information and belief, pursuant to procedure and practice, the Planning Division routinely includes in its reports a recommendation to approve or deny CUP applications, as it did in each report regarding the CUP applications made by the skilled nursing facility that previously occupied the Project Site.

65.   On information and belief, the City's Planning Division staff was aware of opposition to the project by members of the City Council or the Planning Commission, or both, and did not want to risk taking a contrary position on such a high-profile project.

66.   Nonetheless, the Commission Report made several observations, all of which supported the Application.   It noted the benefits of the proposed facility, including the creation of 90 jobs—with salaries between $27,000 and $80,000— and an annual operating budget of $6-7 million.   It concluded that the proposed facility shared numerous "operational characteristics" with the building's prior use as a skilled nursing facility, including the same number of residents, the traffic it would generate, and the use of utilities, among others—characteristics that Escondido found acceptable in relation to the site's prior use.

67.   According to the Commission Report, the children would stay in Southwest Key housing for up to 60 days.   They "are not considered detainees but are residents of the facility which provides daily living services to them, similar to the previous use.   On-site activities will primarily occur indoors, outside areas will

be limited to eating, studying or other quiet activities; no active recreation [or] loudspeakers would be permitted" outdoors.  As the Commission Report confirmed, "Southwest Key staff act as parental authorities; minors are constantly supervised, whether inside or outside of the facility."  Most "services will be provided on-site," and "residents are always accompanied by a staff member(s) when they leave the facility."  The children "would primarily arrive at the facility in small groups."

68.     Importantly, the Commission Report did not identify any adverse impacts on the surrounding areas.  Specifically, it noted that: no expansion of the existing facility was proposed; the "proposed use is not expected to contribute any increases in demand or create significant impacts on fire services"; the Police Department expressed no concerns other than that "Southwest Key provide a 24/7 direct contact to the Police Department," which Southwest Key agreed to do; and that, "[i]n staff's opinion, no significant issues remain unresolved through compliance with code requirements and the recommended conditions of approval."

69.     In a "Notice of Exemption" attached to the Commission Report, the City stated Southwest Key's proposal is categorically exempt from the California Environmental Quality Act, citing "Section 15301, 'Existing Facilities.'"  By doing so, the City effectively admitted Southwest Key's proposed use of the Project Site would involve "negligible or no expansion of an existing use."  Cal. Code Regs., tit. 14, § 15301.

70.     The Notice of Exemption also stated, "The proposed project would not substantially increase the number of daily vehicle trips to the site nor impact vehicular circulation on or around the site."

71.     Southwest Key also received support from other cities in which it operates similar facilities.  For example, as the Mayor of Youngtown, Arizona wrote in a letter that discussed his city's approval of Southwest Key's conversion of a former nursing home to housing for unaccompanied children, "we thoroughly

vetted the organization and principals involved . . . .   All feedback and investigation results were positive.  There were no complaints from neighbors of existing facilities in other cities . . . .   Southwest Key's Youngtown facility . . . opened in May of last year and has quickly become a good neighbor and a valued addition to the community . . . .   I would heartily recommend the organization to any municipality being considered for a facility location."

**72.**   Also attached to the Commission Report was a letter from José Manuel Villareal, a Senior Director with the San Diego County Office of Education, which provides educational services for children housed with Southwest Key.  Dr. Villareal wrote, "We have had the pleasure of observing Southwest Key's work . . . as they have provided an excellent, full range of residential services for unaccompanied alien children," including "the highest quality of culturally competent physical and mental health, education, reunification, and residential services."

**73.**   At the same time, the Commission Report called attention to some residents' concerns regarding the potential that children who would reside at the facility might introduce infectious illnesses into the community, the purported risk that the Project Site would be expanded in the future to house more unaccompanied children, and the alleged potential for neighborhood "disruption[s]" due to intake and processing of children at the facility.  However, the report identified no facts or evidence supporting these concerns.  Rather, the report listed numerous conditions that could be placed on the Project Site's permit that would address any legitimate concerns.

**74.**   Southwest Key agreed to comply with all conditions listed in the report and with any other reasonable conditions that might be suggested by Planning Commission members or otherwise.

**75.**   The City received written comments from members of the community before the Planning Commission hearing, which were attached to the Commission

Report or otherwise made known to the Planning Commission or City Council or both, at or before the hearing, including but not limited to the following:

- "NEIGHBORHOOD CHARACTER and GHETTOIZATION IMPACTS . . . . Just since this facility was announced, I have seen an increase in No Trespassing signs, Beware of Dog signs, signs showing firearms, etc. The character of the neighborhood is deteriorating simply upon the threat of this inappropriate facility . . . . If city leaders wish to have a more affluent and successful population, this takes that desire in the wrong direction by changing the character of one of Escondido's nicest and best neighborhoods in a negative way.";

- "The location of this facility and the unknown youth problems that will likely follow will be very detrimental to the customer and employee experience in the surrounding retail areas.";

- "vote NO on bringing the Federal Detention Facility for illegal Alien youth. It would bring and [sic] undesirable taste to an up and coming town that is moving towards the city of choice to live in North County San diego [sic]";

- "We already know they are criminals, they have broken our immigration laws.";

- "To drop a population bomb such as this into our quiet residential area is a mistake . . . . It is this community itself that has raised itself from the stigma that pertains to much of the Escondido area . . . . [I]nstalling a detainment camp for youths who have entered this country illegally and are bringing with them no assets, yet unknown health, mental and behavioral complications is a certain step in the wrong direction . . . . We have a high incident of illegal occupants in our city of Escondido already . . . .";

- "This program plans to bring in as many as 96 non-citizen immigrants to live in our neighborhood for as many as 45 days at a time.  This is not representative of the demographic of our neighborhood and does not serve us as residents in any way."

76.   At the Planning Commission hearing, members of the public expressed opposition to the project and hostility directed at the Central American children who were expected to reside in the Southwest Key facility, including but not limited to:

- The solution should be to send the children back to their countries of origin;
- Alarms about potential disease the children could bring in to the area, and that Southwest Key had never "exported" anyone back to his or her country;
- The facility being a "stepping stone" to amnesty;
- Fears that the facility was providing a "pipeline for illegal immigrants"; and
- Asserted concern for an "increase in crime" and "third world diseases."

77.   On information and belief, to the extent the foregoing comments were ostensibly targeted at undocumented immigrants or federal immigration policy or both, they also indicate broader national-origin and racial animus toward Latinos or individuals from Latin American countries or both.

78.   On June 24, 2014, the Planning Commission voted unanimously to deny the CUP Application.  City Councilwoman Olga Diaz attended the hearing and later described the Planning Commission's analysis as "very, very cursory."

79.   The Planning Commission scheduled a subsequent hearing for July 22, 2014 to finalize its decision.

**80.**     Planning Commission staff drafted Resolution 6015 for the Planning Commission's consideration on July 22, 2014.  The draft Resolution 6015 denied Southwest Key's CUP application and included "findings of fact," consisting primarily of comments made at the prior hearing, none of which were supported by substantial evidence and many of which were directly contradicted by the Commission Report.

**81.**     At the July 22, 2014 hearing, the Planning Commission again took public comments.  This time, speakers were overwhelmingly in favor of Southwest Key's application, but the Commission voted to approve Resolution No. 6015 as written, thus formally denying Southwest Key's CUP Application.

**82.**     The findings of fact in Resolution 6015 incorporated the purported "concerns" of "Escondido residents" that "the proposed unaccompanied youth care facility at this location would have a negative impact on their neighborhood and diminish their quality of life . . . and change the character of their neighborhood."

**83.**     On information and belief, the Planning Commission's decision and findings were substantially motivated by discrimination because of race, color, national origin, ancestry, or immigration status, or hostility to federal immigration laws, policies, and practices, or a combination of these factors.

**F.     The City Obstructed Southwest Key's Efforts to Operate in Escondido by Manipulating the Land Use Process and Amending the Zoning Code.**

**84.**     On or around July 21, 2014, Southwest Key sent a letter to Planning Division staff communicating that it had successfully negotiated a lease for the Motel Sites.  The letter stated, "In light of the fact we have been defined by the City as a government service operating a residential child care facility, we are prepared to move forward to operate our program at these locations immediately," given that "the current Escondido zoning code shows that government services (except operation centers, police stations and fire stations) and residential care facilities are both permitted uses in the Commercial General zone.  In fact, in May

1   the City issued a Finding of General Plan Conformance for a Health and Human

2   Services Agency facility only one block away from our proposed facility."

3       85.    City staff once again rejected Southwest Key's proposal.  Specifically,

4   on July 31, 2014, Planning Division staff sent a letter to Southwest Key stating that

5   the government services provided by Southwest Key at its facilities did not

6   constitute the type of government services permitted in the General Commercial

7   zone, and again suggested that Southwest Key look in Industrial Zone or

8   Emergency Shelter Overlay areas.

9       86.    Shortly afterward, as noted above, the City amended its Zoning Code

10  to prohibit residential care facilities in the General Commercial zone without a

11  conditional use permit.   This amendment, combined with the City's hostility

12  toward Southwest Key and the children it serves, virtually guaranteed that

13  Southwest Key would not be allowed to operate housing for unaccompanied

14  children at the Motel Sites.   The Planning Commission approved the code

15  amendment on July 22, 2014, the same day it approved the resolution denying

16  Southwest Key's application, and the City Council adopted it on August 6, 2014.

17      **G.    Disregarding Abundant Evidence in Favor of Southwest Key's
        Proposal, the City Council Rejected Southwest Key's Appeal,
18      Again in the Face of Vehement Public Opposition to the Facility.**

19      87.    On August 1, 2014, Southwest Key filed a timely appeal of the

20  Planning Commission's denial of its CUP Application.   A public hearing was

21  scheduled for September 10, 2014, and then rescheduled, at Southwest Key's

22  request, for October 22, 2014.

23      88.    On August 7, 2014, City Mayor Sam Abed gave a national television

24  interview regarding Southwest Key's appeal.   He stated, "We have a moral

25  obligation to the existing residents.  We have about 70,000 Hispanic residents in

26  our city.  We need to help them realize the American dream.  We need to help them

27  be prosperous, have a better life for their families.   But to have more illegal

28  immigrants to our city is a problem for the entire community."   *ACLU Appealing*

*Town's Rejection of Illegal Immigrant Housing*, YOUR WORLD WITH NEIL CAVUTO (Aug. 7, 2014), http://goo.gl/jcHYg4.

89.    On information and belief, the Mayor's comments conflated immigration status with race, color, national origin, or ancestry, and contained unfounded stereotypes that indicate discrimination against persons from Latin America based on their race, color, national origin, ancestry, immigration status, or a combination of these.  The Mayor's comments also reflected resistance or hostility to federal immigration laws, policies, or practices.

90.    On August 8, 2014, Mayor Abed, who was running for reelection, sent a fundraising email message to supporters that stated "Mayor Sam Abed on Fox News Neil Cavuto defending Escondido against ACLU aggression" and contained an internet link to the foregoing interview.

91.    In late September 2014, the City Council moved up the hearing date from October 22, 2014 to October 15, 2014 over Southwest Key's objection. Southwest Key told the City it preferred the later date to provide City staff and Council members ample time to review supplemental materials that it intended to provide.  The City Council nonetheless proceeded with the earlier date.

92.    Despite this accelerated timeline, Southwest Key submitted to the City detailed evidence and expert analyses in advance of the hearing, showing that operating housing for unaccompanied children on the Project Site would benefit the City and cause no adverse impact on the neighborhood.  Southwest Key's evidence rebutted the purported reasons for denying its CUP application and demonstrated that approval of the project conformed to sound land use principles.

93.    Real estate economist Alan Nevin opined that the proposed use would inject millions of new dollars annually into the local economy.  Mr. Nevin undertook "a detailed study of several facilities in California and Arizona that house youths," including four similar facilities operated by Southwest Key, and concluded "there is no correlation between the placement of any of these youth

facilities and either home sales or housing prices in the immediate areas of these facilities." In other words, any concerns or findings with respect to depressing home values in the vicinity of the facility were unfounded.

94. Dr. Thomas Novotny, Professor and Associate Director for Global and Border Health in the Graduate School of Public Health at San Diego State University, former Deputy Assistant Secretary of Health and Human Services for International and Refugee Health, and 23-year veteran of the U.S. Public Health Service, confirmed that "any public health concerns that might be associated with a housing facility for unaccompanied children arriving in the United States . . . are insignificant." In other words, community concerns about the health dangers posed by the facility's proposed use were unfounded.

95. As for parking, Chen Ryan Associates, a transportation planning and traffic engineering firm, made clear that the number of spaces on-site would exceed minimum requirements for a facility of this type and that any overflow parking could easily be accommodated on surrounding streets without adversely impacting the neighborhood, as the City itself concluded in a staff report and Planning Commission decision approving a previous CUP application on the same site. In other words, community concerns about negative impacts on parking caused by the facility's proposed use were unfounded.

96. RECON Environmental, Inc. concluded that "noise levels from operation of the proposed facility would not exceed the Escondido Noise Ordinance or conflict with the policies of the Escondido General Plan Noise Element." In other words, community concerns about negative impacts on noise caused by the facility's proposed use were unfounded.

97. In a staff report to the Mayor and City Council regarding Southwest Key's appeal ("Appeal Report"), submitted before the hearing, the City's Director of Community Development noted that the "numerous phone calls and emails generated by the project . . . exceeded all CUP applications in recent history."

The Appeal Report noted that "[m]any of the speakers at the Planning Commission treated the application and hearing to air perspectives and frustrations on national immigration and similar policy issues."

**98.** The Appeal Report also referred to correspondence in opposition to the project from local lawmakers such as U.S. Representative Duncan Hunter and State Assemblymember Marie Waldron, the former Escondido City Council member who voted for the 2006 Rental Ban with Mayor Abed and Councilman Gallo. According to the Appeal Report, the correspondence "cite[d] serious public policy issues associated with the 'need' for this facility and whether the community requires it." As the Appeal Report states, Southwest Key's project "appears to be primarily to address certain federal level issues that are not necessarily relevant to the local community, and do not justify allowing a use that is not permitted as of right in this zone."

**99.** In contrast to the Commission Report, which discussed the similarity in "operational characteristics" between the proposed use and previous uses of the Project Site, the Appeal Report highlighted alleged differences, stating that "96 active teenagers will have a different physical impact on their surroundings than 96 skilled nursing patients."

**100.** The Appeal Report stated that Southwest Key's proposed use "is intended to serve a population that has garnered a high profile on the national agenda which, in itself, may contribute to special problems for the area, including increased traffic by interested people, crowds or visitors, increased levels of vandalism, or other demands for increased public services. Recent publicized events regarding unaccompanied minors have increased the likelihood that the proposed use will generate significantly more interest than the former residential care facility and could require a larger scale law enforcement presence to maintain the public safety in a residential community. Although original police department responses to this application did not raise these issues, much of the attention has

1   arisen since the application was set for public hearing . . . .  [T]he fact that the

2   proposal is controversial may be considered to have created a special problem in

3   the community.  The involvement of policymakers, both local and national, the

4   involvement of the American Civil Liberties Union, the significant outpouring of

5   public input, the high levels of media coverage, and other aspects of this use have

6   created a polarizing impact on the community."

7       **101.**  The Appeal Report did not provide a recommendation to the City

8   Council as to whether it should approve, modify, or disapprove the Planning

9   Commission's decision.

10       **102.**  At the City Council hearing, the City's assistant planning director, in

11   answering a question from Councilwoman Diaz, admitted that City staff did not

12   "determine what appropriate noise levels are, and traffic levels," for the Project

13   Site, nor did staff "do a confirmation of [the Planning Commission's] resolution."

14       **103.**  Again in contrast to the Commission Report, which emphasized the

15   similarity in "operational characteristics" between the previous and proposed uses,

16   the Assistant Planning Director told the City Council "the operating characteristics

17   are different than what the previous use was."

18       **104.**  The City Council received numerous letters and emails in opposition

19   to the proposed project.  Many of these communications again expressed anti-

20   immigrant sentiment, conflated immigration status with race, color, national origin,

21   or ancestry, and invoked stereotypes based on the race, color, national origin, or

22   ancestry of the children who would reside at the facility.  To quote a few:

23       •  "WE   DONT   [sic]   WANT   THESE   PEOPLE   IN   OUR

24          NEIGHBORHOOD.";

25       •  "Send all the illegals to Washington DC, they're the ones who created

26          this mess by not enforcing the laws and the border!";

27       •  "Please continue to deny the permit to shelter 96 illegal alien children

28          . . . .   The laws should be enforced.   These Children should be

returned to their families in their home countries . . . .   Preserve Escondido!";

- "Why promote or condone illegal activities?   The word illegal immigrant speaks for itself.   We should not allow an illegal citizen to remain in our country.";

- "I am very much against housing these illegals.   I have a teenage daughter at home and do not feel safe with them roaming around the area.   This is a nice neighborhood."

**105.**   Southwest Key's appeal was heard at the City Council meeting on October 15, 2014.   At the hearing, opponents of the project made comments similar to those received in writing before the hearing, such as:

- "It seems to me with Ebola, that we should close our borders and not import these children . . . .   Our government is creating this crisis and pitting people against people.";

- "These people have problems in Mexico, and they should take care of them in Mexico not here on American soil . . . .   I'm asking you to stand with the American people . . . .";

- "You are sitting up there right now because the majority of the people wanted you there, not the minority.   Speak for the majority.   They're the ones that put you up there . . . .   We should be taking care of the people in our city.   We've got to tell the federal government, 'Not in our city.' . . .   We don't need problems from other countries to come here and cause problems.";

- "America first.   America comes first to Americans . . . .   We need to take care of our own citizens before any others, any.   Frankly, I believe most of us are sick of paying for undocumented invaders.";

- "I am opposed to the proposed use for the facility for unaccompanied minors.   This problem is born of decades of failed federal immigration

policy . . . .  Escondido has taken a stand against this center, and I implore the Council to stand by that decision.";

- "I believe in the rule of the land, and I believe in the sovereignty of my nation . . . .  [Y]ou need to remember your residents.  So please, put the emphasis on, for example, on American kids who need homes . . . .";

- "I think we need to send a message to the federal government that they need to take full responsibility, not just 35 days worth";

- "[T]his is a federal issue. It needs to be resolved by the federal government . . . .";

- "[The ACLU] should be working for the American people . . . .  [The federal government] could use that money to secure the border while they . . . allow those children and these illegals to come into this country.";

- "Now, this is all by taxpayer money.  Money taken out of our pockets and given to someone else.";

- "The bottom line is they could use a sanctuary city.  If they have to be in California, we've got our share.  They could go to a sanctuary city.  Why are they picking on Escondido?";

- "We need to focus on our suffering American population.  It's a jungle out there people.";

- "I do not want you guys allowing this because it will set a precedent for the future and the neighboring cities.  Allowing this use would be a gateway . . . to impose illegal amnesty on Escondido and neighboring cities."

**106.**  On information and belief, such comments about immigration status, disease, and crime rely on stereotypes that reflect and incorporate discrimination based on race, color, national origin, or ancestry, or some or all of these factors.

**107.** On information and belief, City staff members and City Council members were aware that many of the public comments against Southwest Key's proposal were based on the race, color, national origin, ancestry, or immigration status of Southwest Key's residents, or hostility to federal immigration policy, or some or all of these factors.

**108.** Through its presentation to the Council, Southwest Key demonstrated that none of the land use concerns raised by the City Council or project opponents were supported by substantial or credible evidence.

**109.** Furthermore, Southwest Key emphasized that it was open to any reasonable condition the City wished to place on its use of the proposed site. For instance, in response to parking concerns, Southwest Key agreed to stagger employees' shift changes and incentivize carpooling. In response to concerns about the availability of off-site recreational space, Southwest Key observed that the City could condition its approval on Southwest Key having agreements in place to use other facilities' space during off-hours (for example, using parks and other public recreation facilities during school hours so use of the facilities by Southwest Key residents would not interfere with their use by Escondido youth).

**110.** Any legitimate land use concern asserted by the City could have been addressed with reasonable conditions while still permitting Southwest Key to operate at the Project Site, but the City Council did not discuss any possible condition for approval.

**111.** At the October 15, 2014 hearing, the City Council voted 4-1 to deny Southwest Key's appeal.

**112.** Explaining his vote to deny Southwest Key's application, Mayor Abed spoke briefly about purported land use concerns but devoted the majority of his remarks to other matters. As he said, "Now, talk about immigration, it is a relevant issue; it is a relevant discussion, and I am a proud immigrant to this country . . . . These children are under the federal government custody. They have

1  been taken care of.  But the administration is pushing this issue to the local

2  government with no solution in sight.  Just bring more, hundreds more, hundreds

3  more.  This facility and this resource should be used for our children, and we have

4  embraced everybody in Escondido; half of our community is Hispanic; we are

5  committed to help all of them in our city regardless of their immigration

6  background.  Now, do we need more?  I don't think so.  We have to use this

7  facility to our children [sic], to our seniors, and to our veterans and that's the

8  bottom line."

9      **113.**  Councilman Morasco, who also voted to deny the application, stated,

10 "What happens if the ground rules change at the federal level?  What happens if

11 the immigrants who are coming across at this time are now categorized and

12 classified all as refugees and there's a whole new set of rules that would begin to

13 apply?"

14     **114.**  Only one City Council member, Olga Diaz, voted in favor of

15 Southwest Key's application.  Councilwoman Diaz concluded after an exhaustive

16 survey of the evidence, that the objections raised were not based on "sound land

17 use principles."  As she noted, "[t]he proposed use, according to our own city staff

18 reports, is similar in operational characteristics" to the prior use, and "[t]his

19 proposal would have a similar impact to the prior use."  She observed, for example,

20 that traffic would be no worse than with the prior use, "[t]here are enough parking

21 spots for what is being generated, and the property's own frontage provides an

22 additional 26 spots," the noise expected from "[t]he proposed use is below what is

23 standard by the City of Escondido" for the neighborhood, "this will fill a need in

24 our community" for jobs, there is "no statistical correlation" between property

25 values and the presence of a facility such as that operated by Southwest Key, and if

26 the City Council was really concerned about the children using public recreational

27 facilities, it could condition the CUP on Southwest Key partnering with private

28 entities.  Councilwoman Diaz further observed, "our own Escondido police

1  department is not concerned about safety, and furthermore, there is no history of

2  repeated calls for service at any of the facilities that Southwest Key operates."

3      **115.**  Following the City Council meeting, City staff drafted Resolution No.

4  2014-13, which purports to represent the collective findings and conclusions to

5  support the City Council's denial.

6      **116.**  The City Council adopted Resolution No. 2014-13 on November 19,

7  2014.  The vote was again 4-1, with Councilwoman Olga Diaz dissenting.

8      **117.**  Before the November 19, 2014 meeting, Southwest Key submitted a

9  detailed traffic analysis as further evidence that its project would not materially

10  impact traffic in the neighborhood.  Southwest Key had intended to submit this

11  report with its other materials, in advance of the October 15, 2014 public hearing,

12  but delays in obtaining necessary information from city staff, coupled with the

13  City's decision to advance that public hearing, made earlier submission impossible.

14  Regardless, the City Council received the information prior to its approval of

15  Resolution No. 2014-13.

16      **118.**  On information and belief, there was no legitimate reason for denying

17  Southwest Key's Application for a CUP to operate at the Project Site.  In denying

18  Southwest Key's Application and approving Resolution No. 2014-13, the City,

19  Planning Commission, and the City Council majority were motivated by their own

20  biases or knowingly acquiesced to neighborhood and community bias based on

21  race, color, national origin, ancestry, immigration status, opposition to federal

22  policy, or some combination of these factors.

23      **119.**  On information and belief, the City rejected Southwest Key's

24  Application with the purpose, intent, and foreseeable effect of preventing and

25  excluding youth from Latin America from residing at the Project Site and in

26  Escondido generally.  Resolution No. 2014-13 is merely a smoke-screen for the

27  City of Escondido's discriminatory intent.

28      **120.**  The City's actions and decisions have prevented Southwest Key from

providing dwellings to unaccompanied children in Escondido, accepting placements of unaccompanied children from ORR in Escondido, or receiving federal funds for doing so. Southwest Key remains ready, willing, and able to operate housing for unaccompanied children in Escondido.

121.    The City of Escondido's conduct has caused or predictably will cause a substantial adverse impact based on race, color, national origin, or ancestry, or some or all of these factors, because the overwhelming majority of children whom Southwest Key houses in its facilities and expects to house in its facility in Escondido are Latinos from Central American nations. The City does not have a legally sufficient justification for its actions.

122.    By taking the actions described above, the City of Escondido has enacted or implemented land-use rules, ordinances, policies, or procedures that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race, color, national origin, ancestry, or some combination of these factors.

123.    By taking the actions described above, the City of Escondido deprived children from Latin America of housing based on race, color, national origin, ancestry, immigration status, or hostility to federal policy, or for some or all of these reasons, in violation of federal and state fair housing laws and the United States Constitution.

### H.    Injuries

124.    The City's discriminatory and unlawful practices have impaired and frustrated Southwest Key's mission and business to provide housing and services to unaccompanied minors from Latin America. By reason of the City's discriminatory and unlawful practices, Southwest Key has suffered and will in the future suffer injury, including but not necessarily limited to economic losses.

125.    Southwest Key's injuries are proximately caused by the City's unlawful practices and can be redressed by a favorable decision in this litigation.

**FIRST CAUSE OF ACTION**

**(Fair Housing Act, 42 U.S.C. §§ 3601 et seq.)**

**126.**   Plaintiff realleges and incorporates herein by reference each preceding paragraph.

**127.**   Defendant's conduct as set forth above made housing unavailable on the basis of race, color, or national origin, or some or all of these factors, in violation of the Fair Housing Act.

**128.**   Plaintiff is an aggrieved person as defined in 42 U.S.C. §§ 3602(d) and (i), has been injured by the Defendant's unlawful conduct, and has suffered damages as a result.

**129.**   Defendant's unlawful conduct was intentional, willful, and made in disregard of the rights of others.

**SECOND CAUSE OF ACTION**

**(Fair Employment and Housing Act, Cal. Gov't Code §§ 12927, 12955 et seq.)**

**130.**   Plaintiff realleges and incorporates herein by reference each preceding paragraph.

**131.**   Defendant's conduct as set forth above made unavailable or denied a dwelling, housing accommodation, or housing opportunity based on discrimination because of race, color, national origin, ancestry, or some or all of these factors, in violation of FEHA.

**132.**   Defendant's conduct as set forth above had the effect, regardless of intent, of unlawfully discriminating on the basis of race, color, national origin, ancestry, or some or all of these factors, in violation of FEHA.

**133.**   Plaintiff has been injured by Defendant's unlawful conduct and has suffered damages as a result.

**134.**   Defendant's conduct was intentional, willful, and made in disregard of the rights of others.

### THIRD CAUSE OF ACTION

### (42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution)

135.   Plaintiff realleges and incorporates herein by reference each preceding paragraph.

136.   Defendant's conduct as set forth above constituted unconstitutional discrimination against unaccompanied children on the basis of race, color, national origin, alienage, or immigration status, or some or all of these factors in violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the United States Constitution.

137.   Plaintiff has been injured by Defendant's discriminatory and unconstitutional conduct and has suffered damages as a result.

138.   Defendant's conduct was intentional, willful, and made in disregard of the rights of others.

### FOURTH CAUSE OF ACTION

### (Supremacy Clause of the U.S. Constitution)

139.   Plaintiff realleges and incorporates herein by reference each preceding paragraph.

140.   The Supremacy Clause provides in relevant part, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ."  U.S. Const., Art. VI, Cl. 2.

141.   Under the Supremacy Clause, a city may not expressly restrict or prohibit the operations of the federal government within its territory, nor may it take any other action aimed at or motivated by preventing the federal government from carrying out its duties, operations, policies, or practices within the city's territory, through contractors or otherwise.

142.   The City's actions and decisions to prevent Southwest Key from operating housing for unaccompanied children in Escondido were substantially

motivated by hostility to federal law, policy, or practice, including but not necessarily limited to immigration.

**143.**   As a result, the City's actions and decisions to prevent Southwest Key from operating in Escondido violated the Supremacy Clause by (a) discriminating against a federal contractor due to its fulfillment of federal policy, (b) improperly interfering with the federal government's exercise of its legal duty to care for unaccompanied children through contracting with qualified entities such as Southwest Key, (c) invading a field exclusively occupied by the federal government, or (d) frustrating the accomplishment of federal policy.

PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court enter judgment against the City of Escondido as follows:

**1.**   Enter an order and judgment declaring that Defendant's acts, practices, and policies complained of herein violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12927, 12955 *et seq.;* the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and the Supremacy Clause of the United States Constitution;

**2.**   Enter an order and judgment for appropriate injunctive relief against Defendant, its officers, agents, servants, employees, successors, assigns, and those in active concert or participation with them, sufficient to remedy the violations described above;

**3.**   Enter an order and judgment awarding monetary damages as allowed by law to compensate Plaintiff fully for any economic losses, diversion of resources, interference with mission fulfillment, or other injuries caused by Defendant's unlawful conduct;

**4.**   Enter an order and judgment awarding punitive damages as allowed by law;

**5.**     Enter an order and judgment awarding Plaintiff's reasonable attorneys' fees, costs, expenses, and interest incurred in prosecuting this action; and

**6.**     Grant Plaintiff such additional relief as justice may require.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury for all issues so triable.

Dated:        May 18, 2015             ACLU FOUNDATION OF SAN DIEGO
                                                        & IMPERIAL COUNTIES

                                                        /s/ *David Loy*
                                                        _____

                                                        David Loy (229235)

                                                        COOLEY LLP
                                                        Mary Kathryn Kelley (170259)
                                                        (mkkelley@cooley.com)
                                                        Blake M. Zollar (268913)
                                                        (bzollar@cooley.com)
                                                        Craig TenBroeck (287848)
                                                        (ctenbroeck@cooley.com)
                                                        Phillip Hoos (288019)
                                                        (phoos@cooley.com)

                                                        COOLEY LLP
                                                        Michelle Rhyu (212922)
                                                        (rhyums@cooley.com)
                                                        3175 Hanover Street
                                                        Palo Alto, California 94304-1130
                                                        Tel:  (650) 843-5505
                                                        Fax:  (650) 849-7400

                                                        BRANCART & BRANCART
                                                        Christopher Brancart (128475)
                                                        (cbrancart@brancart.com)
                                                        Liza Cristol-Deman (190516)
                                                        (lcristoldeman@brancart.com)
                                                        P.O. Box 686
                                                        Pescadero, CA 94060
                                                        Tel:  (650) 879-0141
                                                        Fax:  (650) 879-1103

                                                        [Continued on Next Page]

Cooley LLP
Attorneys At Law
San Diego

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
Joseph D. Rich (applied for admission *pro
hac vice*)
(jrich@lawyerscommittee.org)
Thomas Silverstein (applied for admission
*pro hac vice*)
(tsilverstein@lawyerscommittee.org)
1401 New York Avenue, NW, Suite 400
Washington, D.C. 20005
Tel:  (202) 662-8600
Fax:  (202) 783-0857

Attorneys for Plaintiff
Southwest Key Programs