UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


SOUTHWEST KEY PROGRAMS, INC., )
                              )
            Plaintiff,        )
                              )
        vs.                   )   No. 3:15-cv-0115-H(BLM)
                              )
CITY OF ESCONDIDO,            )
                              )
            Defendants.       )
_____)




DEPOSITION OF DANIELA RIOS

San Diego, California

Wednesday, May 11, 2016




Reported by:
LINDA SILVER RYAN
CSR No. 9915
JOB No. 12203

Exhibit 1
Page 15

1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3

4    SOUTHWEST KEY PROGRAMS, INC., )
                                  )
5              Plaintiff,         )
                                  )
6         vs.                     )  No. 3:15-cv-0115-H(BLM)
                                  )
7    CITY OF ESCONDIDO,           )
                                  )
8              Defendants.        )
     _____)

9

10

11

12

13

14

15         Deposition of DANIELA RIOS, taken on

16      behalf of Defendants, at 4401 Eastgate Mall,

17      San Diego, California, beginning at 9:56

18      a.m. and ending at 2:11 p.m. on Wednesday,

19      May 11, 2016, before LINDA SILVER RYAN,

20      Certified Shorthand Reporter No. 9915.

21

22

23

24

25

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 1
Page 16

1    APPEARANCES:

2

3         For Plaintiff:

4             ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES
             BY:  BARDIS VAKILI, ESQ.
5             BY:  JONATHAN MARKOVITZ, ESQ.
             P.O. Box 87131
6             San Diego, California 92138-7131
             (619) 398-4193
7
         For Defendant:
8
             RUTAN & TUCKER, LLP
9             Attorneys at Law
             BY:  ALAN B. FENSTERMACHER, ESQ.
10            611 Anton Boulevard
             Suite 1400
11            Costa Mesa, California 92626
             (714) 641-5100

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

Exhibit 1
Page 17

1   only thing I ask is that you finish a question pending

2   before the break.  So don't take a break in the middle of

3   a question.  Does that make sense?

4        A    Yes.

5        MR. FENSTERMACHER:  I'm going to mark this as

6   Exhibit 1.

7             (Defendant's Exhibit 1 was marked and

8        is attached hereto.)

9   BY MR. FENSTERMACHER:

10       Q    Have you ever seen this document before,

11  Ms. Rios?

12       A    No.

13       Q    Do you see your name listed sort of in the middle

14  in bold at the center of this document?

15       A    Yes.

16       Q    Do you understand that this document compels you

17  here today to testify in connection with the Southwest Key

18  Programs, Inc. versus City of Escondido lawsuit?

19       A    Yes.

20       Q    If I just say "the city," will you understand

21  that I'm referring to the City of Escondido?

22       A    Yes.

23       Q    By whom are you currently employed?

24       A    Southwest Key Programs.

25       Q    How long have you been there?

Exhibit 1
Page 17.1

1       A    For 15 years.

2       Q    What is your current position?

3       A    Program director.

4       Q    Of which program?

5       A    Lemon Grove and El Cajon.

6       Q    What was your position before you were the

7  program director of Lemon Grove and El Cajon?

8       A    Executive assistant.

9       Q    During what years did you have that position?

10      A    From 2001 to 2006.

11      Q    So then from 2006 to the present you've been a

12 program director?

13      A    Yes.

14      Q    Do I understand correctly at some point Lemon

15 Grove and El Cajon were combined?

16      A    I'm not understanding the combined.

17      Q    Let me try it.

18           At any point were you just the program director

19 of Lemon Grove facility only and then later became program

20 director of Lemon Grove and El Cajon?

21      A    Yes.

22      Q    When did that change occur?

23      A    In 2015.

24      Q    So as the program director for Lemon Grove, El

25 Cajon, what are your duties?

13

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 1
Page 17.2

1        A     I oversee the operations of the program.

2        Q     When you say "the program," are you referring to

3    a facility that houses children?

4        A     Yes.

5        Q     I've seen the acronym UAC.

6              Do you understand what that is?

7        A     Yes.

8        Q     Does that stand for unaccompanied alien children?

9        A     Yes.

10       Q     Is that a term that you use?

11       A     Not vocally, but it's on paper.

12       Q     What is the term that you would use for the

13   children that stay in the Lemon Grove or El Cajon

14   facility?

15       A     "Minors" or "clients" or "children."

16       Q     Would the term "unaccompanied immigrant minors"

17   be different than "unaccompanied alien children"?

18       A     No, it would be the same.

19       Q     So throughout the deposition today, if I refer to

20   a Southwest Key facility, will you understand generally

21   that I'm referring to a facility that houses unaccompanied

22   immigrant children or unaccompanied immigrant minors?

23       A     Yes.

24       Q     Have you ever been involved with any other of

25   Southwest Key's facilities other than Lemon Grove and El

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 1
Page 17.3

1           But you can answer to the extent you think you

2    know.

3       THE WITNESS:  Well, they don't enter the program with

4    Visas.  If they get Visas, the program is not aware of

5    that since they leave the program before they finish their

6    immigration hearings.

7    BY MR. FENSTERMACHER:

8       Q    Right.  Okay.

9           So in other words, if a child did have a Visa or

10   was an American citizen, they wouldn't be at your

11   facilities, right?

12      A    That's correct.  Unless they -- it was later

13   found that they were U.S. citizens, and then they leave

14   our program.

15      Q    So as soon as that was found out, they would

16   leave?

17      A    That's correct.

18      Q    So, in other words, any child with a Visa or that

19   was a citizen would not be permitted to stay at one of

20   Southwest Key's facilities?

21      A    That's correct.

22      Q    And similar question, if a child turns 18, are

23   they then no longer permitted to stay at one of Southwest

24   Key's facilities?

25      A    That's correct.

27

Exhibit 1
Page 18

1   is that sort of everyone's job, I guess?

2       A    That's everyone's job.  But there is what we call

3   youth care workers, that their specific job is to

4   supervise and interact with the kids and make sure that

5   they are doing the different activities that are provided

6   at the program.

7       Q    For each day, is there a printed-out schedule

8   that the Southwest Key employees have that you're making

9   sure that the children are following?

10      A    It's the general Sunday through Saturday

11  schedule, and there is a time frame where there is

12  different activities happening throughout the day.

13      Q    So is every Monday the same, then?

14      A    Yes.

15      Q    So there is not a new schedule every week?

16      A    For the activities of the program, no, it's the

17  same schedule.  Maybe, if it's vocational, it will say

18  vocational, but a different activity of vocational will be

19  provided for the minors.

20      Q    You also mentioned recreation.

21           Are the children at your three facilities

22  recreating off-site?

23      A    Sometimes.

24      Q    Do any of the facilities have on-site recreation

25  facilities?

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 1
Page 19

1       A    I'm sorry?

2       Q    Do they receive mail?  Are they allowed to send

3  and receive --

4       A    They're allowed to receive and send mail.  That's

5  not a frequent practice.  They tend not to do that.

6       Q    Are they allowed to use the telephone?

7       A    They have two phone calls a week.

8       Q    Are they required to -- "they," I'm sorry.

9            Are the children at your facilities required to

10  perform any sort of chores?  I think you mentioned

11  cleaning the room every morning, but is there anything

12  else?

13      A    Yeah.  They do the cleaning of their rooms, the

14  common areas; like after every meal they clean the tables

15  and sweep, the dining area.  And then on Saturdays, they

16  do general cleaning on the common areas, outside grounds.

17      Q    They're not compensated in any way for doing

18  those chores, right, it's sort of part of living in the

19  facilities?

20      A    That's correct.

21      Q    Do any of the children have jobs, some of the

22  older children?

23      A    No.

24      Q    Are the children at your facility ever

25  disciplined?

Exhibit 1
Page 20

1    A    If there -- there is a behavioral chart.  If they
2    break a rule, they might have to write a letter of
3    apology, depending on what rule is broken.  They could not
4    be allowed to go on an outing, depending, again, what the
5    behavior was.
6        Q    Is there any other type of disciplinary action
7    that you've seen taken other than what you've just
8    mentioned?
9        A    No.
10       Q    Would you at any point have to evict a child from
11   a facility if behavior was really bad?
12       A    We don't evict children.  We might ask for a
13   transfer, but we don't evict.
14       Q    So you would transfer to another Southwest Key
15   facility?
16       A    To -- it might be another Southwest Key.  It
17   might be a different level of care.  Office of Refugee
18   Resettlement has different levels of care.  So our
19   facility is the basic level.  There is residential
20   treatment centers, so mental health facilities.  There is
21   staff secure and secure facilities.
22       Q    I'm sorry, you said "basic level."
23            Is there a defined term for the type of facility
24   that you run?
25       A    It's a group home.

34

Exhibit 1
Page 21

1    A    It's done through Juvenile Community and Court
2    Schools.  So JCCS.
3    Q    What kind of other programs does that entity run,
4    do you know?
5    A    I don't know.
6    Q    So children at your facilities are not allowed to
7    leave on their own, right, unaccompanied by a Southwest
8    Key staff?
9    A    They have to be accompanied by an employee.
10   Q    So they don't own bikes or cars?
11   A    No.
12   Q    Can a child ever request to leave, or do they
13   leave at the scheduled times for activities and medical?
14   A    Right.  They leave when they're doing an activity
15   or when they have a medical appointment or education.
16   They just don't leave on their own.  They don't ask to
17   leave, can I go to the corner store, they don't do that.
18   That's not allowed.
19   Q    Not allowed, okay.
20        So even if, say, a child just wanted to go take a
21   walk down the block, not permitted?
22   A    No.
23   Q    Who decides when a child can leave?  Is it you,
24   via -- strike that.
25        Do you generate the weekly schedule?  Is that

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 1
Page 22

1   under your supervision?

2       A    I don't understand what "weekly schedule" you're

3   referring to.

4       Q    You mentioned like a Saturday through Sunday kind

5   of weekly schedule for your facilities.

6       A    Yes.

7       Q    Is that something that you draft?

8       A    I draft it, yes, the schedule.

9       Q    So would anyone else besides you be permitted to

10  allow a child to leave one of your facilities?

11      A    No.

12      Q    On average, how often would you say a typical

13  child would leave your facility in a given week, whether

14  it's education, recreation, medical?

15      A    An average, a typical minor leaves our program

16  daily if they go to the outside school.  And then upon

17  arrival to our program, they have to be seen by the

18  medical team at East County Urgent Care within 48 hours.

19  And then normally they would be leaving to get their TB

20  read, but that kind of has changed, and now they're doing

21  blood drawn, so it doesn't have to be read anymore.

22      Q    Are you talking about when a child first arrives?

23      A    Yes.

24      Q    We'll get to that in a little bit.

25           Have you ever had any children at your facilities

Exhibit 1
Page 23

1   try to run away?

2       A    In the 15 years of being employed, we just

3   recently had a couple of kids run away.

4       Q    What did you do after that happened?

5       A    We called local police and we called immigration.

6       Q    Did the police find them?

7       A    I'm not sure.

8       Q    So they're not back at your facilities now?

9       A    No.

10      Q    Do you know what would happen if they were found

11  by local police or immigration?

12      A    I don't know what they do after, if they're

13  found.

14      Q    If there is a runaway, would that -- would in any

15  instance that minor be brought back to the same facility?

16      A    I would -- I don't know if that has happened, but

17  I have the right to say I don't want to accept the minor

18  back into the program since he already had a history of

19  running away.

20      Q    So in that situation, you might ask ORR for

21  approval to transfer like we talked about earlier?

22      A    I would not accept the placement because it would

23  now be a new placement into the program.

24      Q    So you actually can reject any placement that you

25  want of a new child?

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 1
Page 24

1      A     If it's not meeting -- if we can't meet the needs

2    of the minor, yes.

3      Q     Do you know what happens to the child after that?

4      A     They probably find a placement that could meet

5    the needs of the minor.

6      Q     "They" being ORR?

7      A     Yes.

8      Q     Is your staff permitted to restrain a child that

9    is attempting to escape?

10     A     No.

11     Q     So if there is a child escaping, you just call

12   the authorities?

13     A     Yes.

14     Q     We kind of touched on this a little bit.  I'm

15   curious, how are children placed in your facility?  Does

16   ORR come to Southwest Key and say we have, you know, three

17   new children, do you have room, or how does that work?

18     A     The Office of Refugee Resettlement has a database

19   that immigration uses as well as the programs to refer

20   minors to ORR.  So if a minor is apprehended here in

21   San Diego, they will enter all of their information on

22   what we call the UAC portal, and so then ORR in

23   Washington, D.C. has intake teams, and then they will look

24   at the local facilities close to where the minor is

25   apprehended, and they will send me an email saying this

1    minor will be placed in your facility.

2         Q    Okay.  And --

3         A    So it's all done through like a database.

4         Q    When you say "apprehended," what do you mean?

5         A    When the immigration has taken custody of an

6    unaccompanied minor, so either at -- anywhere past the

7    border into the United States, or minors just go straight

8    to the port of entry and say I'm here and turn themselves

9    in.

10        Q    They will turn themselves in to immigration

11   employees on occasion?

12        A    Yes.

13        Q    But children don't come directly to you and ask

14   to stay at your facilities, do they?

15        A    No.

16        Q    And if they did, would you be permitted to accept

17   them?

18        A    No.  We could only accept minors that are

19   referred through the Office of Refugee Resettlement.

20        Q    So you said that you could reject potential

21   children that were referred by the ORR?

22        A    Yes, if we can't meet their needs.

23        Q    What about if that child had a criminal history,

24   would you accept them?

25        A    Our program is basic-level care, so if it's been

1  identified that he has a criminal history, he would

2  probably be placed in a staff secure or secure facility.

3      Q   When you say we can't meet their needs, what do

4  you mean in general?

5      A   It could be a minor that has psychotropic

6  medication.  In our license, we can't accept kids that

7  have psychotropic medication, we can't meet their needs.

8      Q   Understood.

9          So you mentioned that the children come to you

10  from ORR or with immigration.

11         When they're with immigration or ORR, are they

12  considered arrested?

13      A   I'm not sure --

14  MR. VAKILI:  Objection.  Calls for a legal conclusion.

15  THE WITNESS:  -- what the term is.

16  BY MR. FENSTERMACHER:

17      Q   Would you say they're in federal custody?

18      A   Yes.

19      Q   Can a child transfer to a different Southwest Key

20  facility based on that child's request, saying they

21  weren't getting along with other children at a facility?

22      A   The program determines if the minor needs to be

23  transferred, not the child.

24      Q   So you might see problems and make a decision,

25  but the child is not the one that is going to make that

Exhibit 1
Page 27

1   decision?

2       A    Yes.

3       Q    So --

4       A    It's a team.  It's not me.  It's the case

5   managers, it's the clinicians.  So depending on the minor,

6   there is also a third party, GDIT, that reviews the cases,

7   and then the local representative of Office of Refugee

8   Resettlement will also.  So it's a team that decides.

9       Q    Understood.  Understood.

10           So when a child first arrives, they've been

11  accepted, can you just walk me through their first day,

12  how the intake process would work?

13      A    So they're transported to our program, and --

14      Q    By ORR?

15      A    No.  By a team identified by immigration.

16           And so they're brought to our program.  They

17  go -- we have a room where we do all intakes.  So we

18  process the minors there.  So they are offered a warm

19  meal, a shower and clean clothing, and then they're

20  interviewed by the case manager and assessed by the

21  clinician within 24 hours.

22      Q    That's where they have a TB screen, I think you

23  mentioned, at some point?

24      A    And depending on the time that the minors arrive,

25  if they arrive late in the evening, they will be seen by

Exhibit 1
Page 28

1    the medical team, then, the following day.  Otherwise,

2    they would be seen the same day.

3         Q    Do you attempt to determine if the child has

4    certain vaccinations?

5         A    The Office of Refugee Resettlement has a list of

6    vaccinations that all minors have to receive.

7         Q    I see.

8         A    So if they don't come with their vaccination

9    cards, we just assume they have not received them, so they

10   get all of the vaccinations.

11        Q    I see.

12             Do you get any other data from ORR when they give

13   you a pamphlet of documents about the child when you are

14   intaking the new child?

15        A    The Office of Refugee Resettlement, the only

16   information they provide is the minor's name, the alien

17   number, date of birth, country of origin and family

18   member's phone number that might be here in the U.S.

19             What I get upon intake from immigration could be

20   their notice to appear, so the charges that they have

21   against -- the government has against them, and what we

22   call a 216.  It just has the general information that the

23   minor is being now in the custody of Southwest Key, no

24   longer in the custody of immigration.

25        Q    I see.

1        Notice to appear, is that a reference to

2    immigration court?

3        A    Yes.

4        Q    Does every child at your facility have a pending

5    case with the immigration court?

6        A    Yes.

7        Q    So back to the intake.

8        Do you assign each child a room?  By "you," I

9    mean Southwest Key employees.  You say this is your room?

10       A    Yes.

11       Q    And do they have roommates usually?

12       A    Yes.

13       Q    Does every child have a roommate?

14       A    Not at the El Cajon facility.  There is four --

15   three bedrooms that are by themselves, only one bed fits

16   there.

17       Q    And do any of the rooms have their own bathrooms?

18       A    There is bathrooms in between the bedrooms, so

19   two bedrooms will share a bathroom.

20       Q    Are there locks on the doors to the children's

21   rooms in any of the facilities?

22       A    No.

23       Q    Neither from the inside or outside?

24       A    No, there is no locks.

25       Q    Can children at your facility go to school with

1    other children that are not part of Southwest Key

2    facilities?  I know you said they don't, but can they?

3        A    They can't because that would be a disruption to

4    the other kids since a staff member has to be with them.

5        Q    Right.

6             What about when they go to any recreation

7    programs, do they ever play games with groups of other

8    children?

9        A    We don't allow for them to speak to strangers or

10   interact with strangers, so they wouldn't be interacting

11   with other kids unless it's a planned activity.

12       Q    So if you go to Petco Park, the children aren't

13   permitted to talk to other people at the baseball stadium?

14       A    They're not permitted.

15       Q    And I assume that the children aren't paying

16   Southwest Key any amount of money while they're staying at

17   the facilities?

18       A    No.  No charge.

19       Q    No utilities or anything like that?

20       A    No.

21       Q    Do they have cable or Internet?

22       A    Yes.

23       Q    And they're not paying for those services?

24       A    They have cable.  They don't have access to

25   Internet.

LINDA RYAN REPORTING (714) 225-9696

Exhibit 1
Page 31

1    also an annual report but for fiscal year 2014?

2       A    Yes.

3       Q    Is this for a different facility in the top right

4    corner?

5       A    Yes.

6       Q    Is that the Mesa, Arizona?

7       A    I'm not sure if it's Mesa, Arizona or in Houston.

8       Q    And so -- you're not at all -- do you do any work

9    at all with this facility No. 950?

10      A    No.

11      MR. FENSTERMACHER:  Last document here.

12           (Defendant's Exhibit 10 was marked and

13      is attached hereto.)

14   BY MR. FENSTERMACHER:

15      Q    Marking Exhibit 10 and handing it to you.

16           Do you recognize this document?

17      A    Yes.

18      Q    What is it?

19      A    It's an operations manual.

20      Q    Does this govern the operations of your current

21   facility?

22      A    Yes.

23      Q    And did it govern the operations of the previous

24   stand-alone Lemon Grove facility?

25      A    Yes.

68

Exhibit 1
Page 32

1      Q     Would it have governed the operations of any
2   facility opened in Escondido?
3      A     Yes.
4      Q     Any reason to believe that the information in
5   this manual wouldn't be accurate?
6      A     I don't know.  I don't prepare the manual.
7      Q     This would be prepared by the headquarters?
8      A     Headquarters.
9      Q     If you turn to page 14 of the document, it's page
10  1194 on the Bates stamp number.  Under, do you see section
11  1.26 PREA policy?
12     A     Yes.
13     Q     Do you know what that is?
14     A     Yes.
15     Q     What is it?
16     A     It's the PREA policy, so it's prison -- I don't
17  remember the acronym to that, but it's a policy that ORR
18  has implemented in June of last year.
19     Q     What is that policy?
20     A     So we -- it's just a policy to report any sexual
21  abuse, sexual harassment in the programs.
22     Q     Are you familiar with the document referred to, I
23  believe it's the Southwest Key PREA policies and
24  procedures?
25     A     Yes.

Exhibit 1
Page 33

1      THE WITNESS:  No.

2          (Recess.)

3  BY MR. FENSTERMACHER:

4      Q      So, we talked a lot about the Lemon Grove

5  facilities you oversee and, specifically, the 48-bedroom

6  larger facility.

7          Would you anticipate that had a facility been

8  approved in Escondido at either of the motel sites or the

9  Del Diablo site, that it would have been run in a

10  substantially similar manner as the 48-bed facility that

11  you oversee?

12      A      It would be the same with the exception of

13  transporting kids to an educational facility outside of

14  the program.

15      Q      You said they would -- at least at Del Diablo it

16  would have been on-site?

17      A      Yes.

18      Q      But everything else would be the same?

19      A      Yes.

20      Q      And similar cooperation agreement that we talked

21  about earlier?

22      A      Yes.

23      Q      Are the children in your facilities, are they

24  allowed to modify their rooms at all?

25      A      What do you mean by "modify"?

158

Exhibit 1
Page 34

1     Q    Decorate, for example, or move furniture.

2     A    Yes.  They could decorate their rooms with arts

3  and crafts that they're doing in the arts and crafts class

4  or projects that they work with in the school, with the

5  school.

6     Q    But they're not bringing outside materials into

7  their rooms?

8     A    Just stuff that is being provided by the program.

9     Q    And do they have any decision-making as far as

10  what furniture is in their room?

11     A    No.  The program provides that prior to the

12  minors coming into the program.

13     MR. FENSTERMACHER:  Okay.  Well, that's all I have.  I

14  understand you have a few questions.

15     MR. VAKILI:  Yeah.  Just a couple of minutes' worth.

16                       EXAMINATION

17  BY MR. VAKILI:

18     Q    I believe you testified earlier that you

19  characterized Ismael as the one heading up the search for

20  a facility in Escondido; is that correct?

21     A    Yes.

22     Q    That was a change from his previous

23  responsibilities?  Was that a change of his previous

24  responsibilities?

25     A    At the moment, it was in addition to his

Exhibit 1
Page 35

```
 1   STATE OF _____)
                                      )  ss.
 2   COUNTY OF _____)

 3

 4

 5

 6

 7

 8

 9       I, the undersigned, say that I have read the foregoing

10   deposition, and I declare, under penalty of perjury under

11   the laws of the State of California, that the foregoing is

12   a true and correct transcript of my testimony contained

13   therein.

14       EXECUTED this  22  day of  June          ,

15   2016, at _____.

16

17

18   _____
     DANIELA RIOS
19

20

21

22

23

24

25
```

Exhibit 1
Page 36

1

2

3     I, the undersigned, a Certified Shorthand Reporter of

4   the State of California, do hereby certify:

5     That the foregoing proceedings were taken before me at

6   the time and place herein set forth; that any witnesses in

7   the foregoing proceedings, prior to testifying, were

8   placed under oath; that a verbatim record of the

9   proceedings was made by me using machine shorthand which

10  was thereafter transcribed under my direction; further,

11  that the foregoing is an accurate transcription thereof.

12    I further certify that I am neither financially

13  interested in the action nor a relative or employee of any

14  attorney of any of the parties.

15    IN WITNESS WHEREOF, I have this date subscribed my

16  name.

17

18  Dated: _____ 5/25/16 _____

19

20          _____

21          LINDA SILVER RYAN
            CSR No. 9915

22

23

24

25

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 1
Page 36.1