UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


SOUTHWEST KEY PROGRAMS, INC.,  )
                              )
        Plaintiff,      )
                              )
  vs.                    )  No. 3:15-cv-0115-H(BLM)
                              )
CITY OF ESCONDIDO,         )
                              )
        Defendant.      )
_____)


DEPOSITION OF ISMAEL AVILEZ

SAN DIEGO, CALIFORNIA

WEDNESDAY, MAY 18, 2016


Reported by:

DENISE T. JOHNSON

CSR NO. 11902

No. 12204

1

Exhibit 2
Page 37

1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4    SOUTHWEST KEY PROGRAMS, INC.,   )
                                     )
5                Plaintiff,          )
                                     )
6       vs.                          )   No. 3:15-cv-0115-H(BLM)
                                     )
7    CITY OF ESCONDIDO,              )
                                     )
8                Defendant.          )
     _____ )

9

10

11

12            DEPOSITION OF ISMAEL AVILEZ,

13            taken on behalf of the defendant at

14            4401 Eastgate Mall, San Diego, California,

15            at 10:05 a.m., on Wednesday, May 18, 2016,

16            before DENISE T. JOHNSON, CSR NO. 11902.

17

18

19

20

21

22

23

24

25

LINDA RYAN REPORTING (714) 225-9696

Exhibit 2
Page 38

1    APPEARANCES OF COUNSEL:

2        For Plaintiff:

3            COOLEY
             CRAIG TENBROECK
4            4401 Eastgate Mall
             San Diego, California 92121
5            858.550.6160
             ctenbroeck@cooley.com
6
         For Defendant:
7
             RUTAN & TUCKER, LLP
8            BY:  ALAN B. FENSTERMACHER, ESQ.
             611 Anton Boulevard
9            Suite 1400
             Costa Mesa, California 92626
10           714.641.5100
             afenstermacher@rutan.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 2
Page 39

1    throughout the day today, will you understand that to

2    mean a facility where the occupants are these

3    unaccompanied children that we're talking about?

4        A    Can you repeat that?  I'm sorry.

5        Q    In today's discussion, if I say "a Southwest

6    Key facility" will you understand that to mean a

7    facility where the occupants are these unaccompanied

8    immigrant children or UACs?

9        A    Yes.

10        Q    So your current position is regional

11    executive director?

12        A    Correct.

13        Q    And what are your duties in that position?

14        A    I oversee the programs of Pleasant Hill,

15    Northern California, three programs in El Paso, Texas

16    and in San Antonio.  My job is to supervise the

17    programs, provide technical support to the program

18    directors.  And one of the duties is being a liaison

19    between our corporate office and the programs

20    themselves.

21        Q    Would the four program directors at those

22    four programs report directly to you?

23        A    Yes.  And it's five.  Three in El Paso and

24    one in San Antonio.

25        Q    Okay.  Got it.

Exhibit 2
Page 39.1

```
 1           All five of those facilities are Southwest
 2    Key facilities that house UACs?
 3           A    Yes, sir.
 4           Q    When did you start working at Southwest
 5    Keys?
 6           A    Approximately 15 years ago.
 7           Q    What position did you start in?
 8           A    As a clinician.
 9           Q    Where was that?
10           A    At Southwest Key.
11           Q    I'm sorry.  Was that at a particular
12    facility?
13           A    What we know as the El Cajon facility.
14           Q    At some point, you were the program director
15    of the El Cajon facility; correct?
16           A    Correct.  After a few years, I got promoted.
17           Q    So you spent three years as a clinician?
18           A    Yes, sir.
19           Q    Then after that point, you were promoted to
20    program director?
21           A    Correct.
22           Q    Do you remember about what year that was?
23           A    Without having the information in front of
24    me, I would only speculate.
25           Q    Would that be in the early 2000s?
```

15

Exhibit 2
Page 39.2

1          Would any of the children in your facilities
2    have American Visas while they're staying there?
3          A    It's possible.
4          Q    Okay.  I understood, once there was an
5    American visa or any sort of, like, permanent
6    residence, the child would then be leaving the
7    facility; is that right?
8          A    Right.
9          Q    So if you have a child that has a visa or is
10   a U.S. citizen or otherwise has permanent residence
11   status and they did not live in your facility but
12   they wanted to, would be they be permitted to live in
13   a Southwest Key facility?
14         A    No.
15         Q    Are the occupants of Southwest Key
16   facilities, at least the ones you oversee, would you
17   say that they're supervised consistently throughout
18   the day?
19         A    Yes.
20         Q    At a one-to-eight ratio; is that right?
21         A    Yes.
22         Q    So one Southwest Key employee for every
23   eight children?
24         A    Yes.
25         Q    Are the occupants permitted to have

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 2
Page 40

1  certain rules that exist that if an occupant were to
2  break, there would be negative consequences?
3          MR. TENBROECK:  Objection.  Vague.
4          THE WITNESS:  We perform a strength-based
5  program, so negative consequences are nothing that we
6  traditionally do.
7  BY MR. FENSTERMACHER:
8      Q    Is it possible for a child to lose certain
9  privileges, like a certain outing they can no longer
10 going on, based on behavioral issues?
11     A    Yes.
12     Q    Of your five facilities that you oversee, do
13 any of the five facilities have space for recreation
14 on-site?
15     A    Do any?  Is that the question?
16     Q    Yes.
17     A    Yes.
18     Q    How many?
19     A    They all have recreation space.
20     Q    Would that be outdoor space in all cases?
21     A    Outdoor space with the exception of Pleasant
22 Hill.
23     Q    Okay.  So is there also -- in all five
24 facilities, are there also off-site recreation
25 activities planned?

LINDA RYAN REPORTING (714) 225-9696

Exhibit 2
Page 41

1     A     I just remember Pleasant Hill and Franklin.

2     Q     Would not have outside recreation?

3     A     Yes, sir.

4     Q     So at all five locations, are the occupants

5  periodically transported off-site for recreational

6  activities?

7     A     Franklin and Pleasant Hill.

8     Q     Not in the other three?

9     A     Right.

10    Q     So for Pleasant Hill and Franklin do you

11  have agreements in place with school or local parks?

12  How does the off-site recreation work?

13    A     In Pleasant Hill, they use community space.

14  So there is a park that they use that's about a block

15  away from the facility.  So there isn't any contracts

16  or MLUs in place from what I understand.

17    Q     And what about Franklin?

18    A     Franklin, from what I understand and have

19  seen is that they utilize -- I've seen them play

20  indoor soccer, but I don't know what the arrangement

21  is.

22    Q     Is it true when there is off-site

23  recreation, the Southwest Key children are not

24  allowed to interact with other children that are

25  outside of the program that might be at that same

36

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 2
Page 42

1    park?

2         A    They're strongly encouraged to limit their

3    interaction, yes.

4         Q    Then they would be supervised by the

5    Southwest Key employees the entire time?

6         A    Correct.

7         Q    There is a legal requirement for one hour of

8    large muscle recreation during the week and three

9    hours on the weekends; correct?

10        A    Correct.

11        Q    Does Southwest Key have a policy that allows

12   for more than four hours of recreation a week?

13        A    There is no policy in place for that.

14        Q    Does that typically occur?

15        A    In some programs.

16             Can you rephrase the question?

17        Q    Let's limit it to the five facilities that

18   you oversee.

19        A    Sure.

20        Q    Would you say that the children are

21   permitted to recreate for more than four hours a

22   week?

23        A    It's not disallowed, and I'd imagine it's

24   not that common.

25        Q    At all five of your facilities, do you have

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 2
Page 43

1    a Saturday through Sunday schedule that is printed

2    out and all your employees would look at the schedule

3    so they'd know what to do at 9:00 a.m. on Monday?

4          A     Yes.

5          Q     And that's the same every week?

6          A     In most cases, it is.  But there's always

7    variances.

8          Q     That would list out the time that the

9    children would wake up, eat breakfast, eat the

10   various meals, go to bed?

11         A     Yes.

12         Q     What happens -- let's say a child doesn't

13   want to go to bed or lights out at the prescribed

14   time, what would you do to encourage that child to go

15   to bed?

16         A     We would talk to the child and try to find

17   out what's happening.

18         Q     Would there ever be any sort of disciplinary

19   action?

20         A     For not going to sleep?  I'd imagine not.

21         Q     Talking about the Escondido site, which we

22   are going to talk about much more later, it's my

23   understanding that at least with respect to the site

24   on Avenida del Diablo, the children would have been

25   driven to local parks for recreation.

Exhibit 2
Page 43.1

1      A     That would have been a feature, yes.

2      Q     What about the motel sites?  Would there

3  have been off-site recreation for those as well?

4      A     I would have mentioned that that wouldn't be

5  the case.

6      Q     Okay.  Off-site would not be the case?

7      A     Yes.

8      Q     At the El Cajon facility when you were

9  program director, were the children -- did the

10  children go to school at a school run by the Juvenile

11  Court and Community Schools?

12      A     Yes.

13      Q     And is that still the case?

14      A     Yes, sir.

15      Q     Do you know what other groups of children

16  that Juvenile Court and Community Schools provides

17  school services to?

18      A     JCCS in particular?  I don't know all of

19  them.

20      Q     Is it to juvenile halls?

21      A     That's my understanding.

22      Q     But the Southwest Key children have their

23  own classroom?

24      A     They don't interact with any of the other

25  JCCS.

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 2
Page 44

1   projects.

2        Q    The children at Southwest Key facilities are

3   not allowed to leave the facilities on their own at

4   any time; is that right?

5        A    There's layers to that.  Can you be more

6   specific, I guess?

7        Q    At the five facilities you oversee, would a

8   child be permitted to leave on his or her own at any

9   time?

10       A    A child can leave at any time that they

11  would wish.  Our focus is to supervise and encourage

12  kids to stay in our program.

13       Q    Can a child open a door and just walk out?

14       A    Yes.

15       Q    At all locations?

16       A    At all locations, they can do that.

17       Q    Can the children have bikes and cars and --

18  strike that.

19            If a child leaves, are they permitted to

20  come back?

21       A    There's been some cases.

22       Q    So you've had a child leave, in your

23  experience?

24       A    Yes.

25       Q    And what did you do?

                                                        42

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 2
Page 45

1     A     There's a protocol that we have to follow.
2  So the protocol is that we contact the local law
3  enforcement.  We contact the federal government, and
4  we contact licensing, and then our own internal
5  process of informing all the supervisors.
6     Q     When you contact local law enforcement, what
7  are you asking them to do?
8     A     We are just reporting that someone has run
9  away.
10    Q     In no situation would a child leave one of
11 your facilities and you would do nothing?
12    A     Correct.
13    Q     You wouldn't say, "Okay.  That's fine"?
14    A     Correct.
15    Q     To go back to my original question, a child
16 wouldn't be permitted to just go for a walk or to the
17 corner store and come back without anything
18 happening?
19    A     Correct.
20    Q     How many children have you had at the
21 facilities you've overseen that have ran away?
22    A     That I've overseen?  Can you be more
23 specific?
24    Q     Well, okay.  How about when you were the
25 program director at El Cajon, how many children did

LINDA RYAN REPORTING (714) 225-9696

Exhibit 2
Page 46

1  you have run away during your time period there?

2       A    That's a very broad range of time.  Not too

3  many.

4       Q    Would you say less than ten?

5       A    No.

6       Q    In the ten-plus years?

7       A    Less or more?  Somewhere around there.

8       Q    Okay.  And do you recall any of those

9  children coming back to the same El Cajon facility

10  and living there after they ran away?

11      A    I don't remember the specifics, but I

12  believe there was a case.

13      Q    In other cases, would a child that ran away

14  from one of your facilities be transferred to a

15  staff-secure facility?

16      A    Can you repeat that?  I'm sorry.

17      Q    If a child ran away -- in cases where a

18  child has run away from your facilities, have they

19  ever been transferred to a staff-secure facility as a

20  result?

21      A    I would imagine.  I'm not sure.

22      Q    Okay.  Is that because staff-secure

23  facilities are essentially a higher facility than the

24  shelter/group homes like the El Cajon facility?

25      A    Yes.

                                                    44

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 2
Page 47

1    Q    Would that be considered a punishment to be
2    transferred to a staff-secure facility?

3    A    That would be a precaution.

4    Q    In your experience, are the children afraid
5    of being transferred to a staff-secure facility?

6    A    I'm not sure.

7    Q    Do you think that most children prefer to
8    stay in the shelter/group home category of facilities
9    as opposed to staff-secure?

10    MR. TENBROECK:  Objection.  Calls for
11   speculation.

12    THE WITNESS:  I'd imagine.  I'm not sure.
13   BY MR. FENSTERMACHER:

14    Q    How about in your other facilities other
15   than El Cajon, can you remember any specific runaway
16   incidents in the year or so that you have been
17   regional executive director?

18    MR. TENBROECK:  Objection.  Vague as to
19   "runaway incidents."

20    THE WITNESS:  Can you repeat that, please?

21    MR. FENSTERMACHER:  Can you read that back,
22   please.

23    (Question read.)

24    THE WITNESS:  Two adolescents at the
25   Pleasant Hill program.

Exhibit 2
Page 48

1    should be in a shelter/group home, staff-secure

2    facility?

3        A    No.

4            ICE and DHS do their screening, their

5    vetting.  And they refer to the department of -- the

6    division of children's services under ORR.  Can I say

7    ORR?  How do you recognize that?  Federal government,

8    I guess?

9        Q    Yeah.  So from here on out, if one of us

10   says "ORR," you'll understand that to mean Office of

11   Refugee Resettlement?

12       A    Yes.

13       Q    Okay.

14       A    So ORR -- so DHS -- ICE refers to ORR.  And

15   ORR, based upon the reports and information they've

16   gotten in interviews with DHS and ICE make that

17   determination.

18       Q    That determination as to what type of

19   facility the child will go into?

20       A    Right.

21       Q    And so Southwest Key doesn't make that

22   determination?

23       A    At that point, ORR contacts the program.

24   And the program -- in most cases, they accept.

25       Q    Do the children ever specifically choose

1  Southwest Key or do they have any ability to choose

2  Southwest Key over other companies that provide

3  similar services?

4      A    No.  It's the federal government who makes

5  the decision.

6      Q    They can't go to ORR and say, "I heard

7  Southwest Key is great.  I'd like to stay there"?

8      A    We'd like to think so.

9      Q    Can you walk me through a typical first day

10  in your experience as program director of a child

11  when they've been brought to your facility?

12      A    Okay.  So the adolescent comes into the

13  facility.  The first thing we do -- the first rule is

14  that we greet the minor.  We have to file all the

15  paperwork with DHS, ICE, or whoever it is, make sure

16  we're getting all the necessary paperwork.  We meet

17  with the adolescent.  We offer them water and food

18  and comfort them, letting them know that their care

19  has changed from that of ICE and DHS to the work that

20  we're doing, social service, and begin to establish a

21  rapport.  That is the most important thing,

22  establishing a rapport with the adolescent, letting

23  them know what to expect in the next couple of hours

24  to days for their comfort levels.

25          We'll start processing all the forms that we

Exhibit 2
Page 50

1   have.  So the main thing is screening for

2   assessments.  They're screening for any trafficking,

3   any suicidal issues, any mental health issues,

4   getting demographic information, providing them a

5   shower, inventorying their clothing and everything

6   they have, and providing them a new set of clothing.

7   That's usually within the first couple of hours.

8        Q    When you inventory the clothing, are they

9   getting that back?

10       A    They're given the option of holding onto it,

11   or us holding onto it.  And we also check for

12   appropriate clothing.

13       Q    So do they have to wear the Southwest

14   Key-provided clothing?

15       A    They have an option of clothing.

16       Q    At that point, they'd be assigned to a room

17   after the first few hours?

18       A    They're assigned to a room, yes.

19       Q    Typically with a roommate?

20       A    Yes.

21       Q    And they wouldn't have any choice in the

22   matter as far as which room they were assigned?

23       A    They've never requested a room with a view

24   or anything.

25       Q    As part of the screening process, does

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 2
Page 51

1  facility?

2          MR. TENBROECK:  Objection.  Vague.

3  BY MR. FENSTERMACHER:

4      Q    A hypothetical where you had a child that

5  for whatever reason it wasn't working out at your

6  facility, do you have the ability to request a

7  transfer to another facility?

8      A    Yes.

9      Q    That has to be approved by ORR?

10     A    Yes.

11     Q    Is there anything else you've ever done in

12 your role at Southwest Key with regard to moving a

13 child?  Would you ever just kick them out of the

14 program entirely?

15     A    No.

16     Q    At any time, would a child from one of your

17 facilities go directly from your facility to a jail

18 or a prison for any reason?

19     A    I've never seen that happen.

20     Q    When a child is determined to be 18, what

21 happens?

22     A    They would go back -- there's different

23 scenarios.

24     Q    Let's say you have an age-determined adult,

25 that their immigration status case was still pending,

LINDA RYAN REPORTING (714) 225-9696

Exhibit 2
Page 52

1   what would happen to them?

2        A    I guess the easiest answer is their care and

3   custody goes back to ICE, and there's different

4   things.

5        Q    What are the different things that you know

6   of?

7        A    Most recently they do their own

8   reunifications.

9        Q    With family members?

10       A    Yes.

11       Q    But to your knowledge, ICE wouldn't be

12  placing a child in some sort of a federal prison?

13  I'm sorry, not a child, an 18-year-old in a federal

14  prison?

15       A    I don't know the answer to that.

16       Q    Once they go back into the custody of ICE,

17  your role is over at that point?

18       A    It ceases at that moment, yes.

19       Q    Is my understanding correct that a child is

20  released from your facility under four different

21  categories?  Again, from Southwest Key facilities,

22  there are four different categories where a child is

23  allowed to be released?

24       A    Repeat that question.  I'm sorry.

25       Q    Correct me if I'm wrong, my understanding is

Exhibit 2
Page 53

1      Q      The number is 90ZU0029.

2             Do you see that?

3      A      Yes, sir.

4      Q      Is that the facility that you were the

5  program director of?

6      A      Yes.

7      Q      When you were the program director, was the

8  program subject to a Cooperative Agreement that would

9  have been substantially similar to this agreement for

10  Lemon Grove?

11     A      Yes.

12     Q      To your knowledge, are the cooperative

13  agreements between Southwest Key and the federal

14  government substantially similar in content for

15  various facilities?

16     A      Can you repeat the question?

17     Q      So the five facilities you oversee

18  currently, are all five run pursuant to Cooperative

19  Agreements?

20     A      Yes.

21     Q      Are those Cooperative Agreements essentially

22  the same?

23     A      I would imagine so.

24     Q      Would you imagine those are essentially the

25  same as the Lemon Grove or El Cajon Cooperative

1    Agreements?

2         A    Yes.

3         Q    If a facility had been opened in Escondido,

4    it would be run pursuant to a similar Cooperative

5    Agreement?

6         A    Yes.

7         Q    And the Escondido site, any site opened in

8    Escondido would have been a classified a

9    shelter/group home; is that right?

10             MR. TENBROECK:  Objection.  Calls for a

11   legal conclusion.

12             THE WITNESS:  It would be classified as

13   shelter/group home?

14   BY MR. FENSTERMACHER:

15        Q    Yes.

16        A    Group home is what I understand.

17             Shelter, I believe that's the case for ORR's

18   classification, but I'm not sure.

19        Q    Look at 647 in the bottom right-hand corner,

20   it's Page 9 of the document.  Under D, it says,

21   "Shelter/Group Home"; correct?

22        A    Huh-uh.

23        Q    And that would be the classification, right,

24   for a --

25        A    Yes.

Exhibit 2
Page 55

1    to the Crittenton facility in Fullerton?

2        A    The only cases would have been foster care,

3    if I remember.  There might have been others, but I

4    don't recall.

5        Q    Again, any transfer would be approved by the

6    ORR?

7        A    Yes.

8        Q    This is Exhibit 4.  It says "Cooperative

9    Agreement" on the top there.

10           Do you see that?

11       A    Yes, sir.

12           (Exhibit 4 was marked by the CSR for

13           identification and is attached hereto.)

14   BY MR. FENSTERMACHER:

15       Q    And then an entry, "Southwest Key Programs,

16   Inc.," and then "90ZU0149."

17           Do you see that?

18       A    Yes.

19       Q    Is that the combined El Cajon/Lemon Grove

20   grant?  Do you know?

21       A    From what period?

22       Q    If you take a look at Page 468, which is the

23   very last page, It looks like the document was signed

24   by the ORR and the CEO of Southwest Key in 2015.

25           Do you see that?

                                                      72

Exhibit 2
Page 56

1      A    Yes.

2      Q    And it looks like "Effective Agreement"

3  under the duration of agreement, above that, it says,

4  "October 2014 to October 2017"?

5      A    Yes.

6      Q    Does this refresh your recollection at all

7  that this might be the Lemon Grove and El Cajon

8  combined?  I noticed that the numbering is not listed

9  on Exhibit 3 on the very front.

10     A    Right.

11     Q    So you don't know what number he's referring

12 to?

13     A    Right.

14          There's different grants for different use,

15 so they provide a different numbering system.

16     Q    Okay.

17     A    So I'm not sure is what I'm saying.

18     Q    Is this format of the Cooperative Agreement,

19 Exhibit 4, is this an updated version of Exhibit 3

20 that we were looking at before?

21     A    Is this an updated version?

22     Q    To Exhibit 3?

23     A    It appears to be, yes.

24     Q    It looks like it is far less pages.

25          Do you know if it's in addition to

73

Exhibit 2
Page 57

1      Q     If you look at the first page, it looks like
2   this is the December 21st, 2015 version?
3      A     Yes.
4      Q     Is this the version that's in effect right
5   now for the five Southwest Key facility right now
6   that you oversee?
7      A     There might have been some updates.
8      Q     Generally, this governs -- is it training
9   and just employment of Southwest Key employees that
10  work at the UAC facilities?
11     A     Yes.
12     Q     Okay.  I'll mark another document here as
13  Exhibit 10.
14           Do you recognize this document?
15     A     Yes.
16           (Exhibit 10 was marked by the CSR for
17           identification and is attached hereto.)
18  BY MR. FENSTERMACHER:
19     Q     It appears to say unaccompanied minors
20  federal program -- sorry.  Strike that.
21           It says, "Unaccompanied Minors Federal
22  Program Youth Care Services Manual."
23     A     Yes.
24     Q     In the bottom right corner, it's Bates 1263.
25           Do you see that?

1      A     Yes.

2      Q     And what is this document?

3      A     This is a general manual that's been put out

4  by the Director of Youth Care Worker Services.

5      Q     Would this apply to all Southwest Key's UAC

6  facilities?

7      A     Yes.

8      Q     This would have governed a facility had it

9  been opened in the City of Escondido in 2014?

10     A     Yes.

11     Q     Again, would you consult this document as

12 part of your current duties as the regional executive

13 director?

14     A     Yes.

15     Q     I'll ask you to turn to Page 1270, which is

16 internal Page 4 of the document.

17           MR. TENBROECK:  I'll object.  It calls for

18 speculation as to whether this document would govern.

19 BY MR. FENSTERMACHER:

20     Q     Under "Professional Relationships With

21 Youth," under No. 1, it says, "Staff shall not

22 initiate or maintain ongoing relationships after

23 transfer or release of the minor of the program."

24           Do you see that?

25     A     Yes.

Exhibit 2
Page 59

1    Q    Why were ongoing relationships not

2    permitted?

3    A    Boundaries.  We need to maintain

4    professional boundaries.  And our contract is limited

5    to the scope of services while the minors are in

6    care.

7    Q    So if an employee had a personal connection

8    with a child, they wouldn't be permitted to go check

9    on them on their own personal time after they're

10   released?

11   A    No.

12   Q    Please turn to Page 1273, which is Page 7

13   internally in the document.  If you would, just take

14   a look at the bottom.  There is a heading that says,

15   "What is and not allowed for minors."

16        Do you see that?

17   A    Uh-huh.

18   Q    And if you flip to the next page, it looks

19   like that list continues on Page 1274?

20   A    Uh-huh.

21   Q    Just take a quick look at that list.  Can

22   you tell me if these are the applicable rules as you

23   know them for the five facilities that you oversee?

24   A    So you are asking did I review --

25   Q    Yeah, the bottom of 1273, "What is and not

Exhibit 2
Page 60

1   allowed for minors," and then the next page.  Just
2   take a look, and tell me if these are the rules as
3   you understand them.
4              (Witness reviews document.)
5              THE WITNESS:  Yes.
6   BY MR. FENSTERMACHER:
7      Q    These rules apply to all the five
8   facilities?
9      A    Yes.
10     Q    And it would have applied to a facility in
11  Escondido had it been opened?
12             MR. TENBROECK:  Objection.  Calls for
13  speculation.
14             THE WITNESS:  Yes.
15  BY MR. FENSTERMACHER:
16     Q    And is there a supplemental list of dos and
17  don'ts that you know of outside of this document
18  provided by Southwest Key?
19     A    Yes.
20     Q    What is that?
21     A    Each program will have their own policy
22  procedure.
23     Q    Presumably, those policies and procedures
24  wouldn't be able to conflict with these rules in
25  Exhibit 10, on Bates 1273 and -74?

Exhibit 2
Page 61

1    A    Yes, but there's exceptions.

2    Q    Turn to Page 1279, it's Page 13 internally,

3  under No. 5, it says, "Place the RED SWK bracelet and

4  explain to new intakes that the bracelet is for

5  medical clearance only and that as soon as they're

6  cleared, the bracelet will no large be worn."

7         Do you see that?

8    A    Yes.

9    Q    And "medical clearance," does that mean

10 received vaccinations, or what does it mean?

11   A    Yes.

12   Q    Does it mean anything other than that?

13   A    Vaccinations, and that they had a physical.

14   Q    And then No. 6, it says, "If the new intakes

15 are body piercing, they need to take off the body

16 jewelry and be stored in the Money Bag."

17   A    Yes.

18   Q    And money bag is capitalized?

19   A    Yes.

20   Q    What is the money bag?

21   A    Money bag, from my understanding -- I didn't

22 write the document -- but it's just a Ziploc bag

23 where they put all the valuables.

24   Q    Is that kept by Southwest Key's staff?

25   A    Yes.

85

Exhibit 2
Page 62

1       Q    For the duration of the child's stay?

2       A    Yes.  It is kept under safeguard.

3       Q    But not in the child's possession?

4       A    Correct.

5       Q    Turn to Page 1348 now which is towards the

6  back.  It is Page 82 internally in the document.  And

7  so this page is titled "List of Inappropriate

8  Behavior and Natural Consequences."

9            Do you see that?

10      A    Yes.

11      Q    In the matrix below, there's several

12 columns.  Does that list certain actions and the

13 consequences of those actions if the child takes

14 those actions?

15           (Witness reviews document.)

16           THE WITNESS:  What was the question?

17           MR. FENSTERMACHER:  Can you read the

18 question back, please.

19           (Question read.)

20           THE WITNESS:  Yes.

21 BY MR. FENSTERMACHER:

22      Q    There's a reference to line of sight in --

23           MR. TENBROECK:  Can you show me where you

24 are looking at?

25           MR. FENSTERMACHER:  Yeah, no problem.

Exhibit 2
Page 63

 1    BY MR. FENSTERMACHER:

 2        Q    Sorry.  Turn to Page 1349.  In the bottom

 3    right corner of the matrix, under No. 3, the very

 4    last bottom right corner, it says, "Line of sight

 5    supervision."

 6             Do you see that?

 7        A    Okay.

 8        Q    What does that mean?

 9        A    Line of sight supervision means that they

10    may have wandered off, or can't be visibly accounted

11    for.

12        Q    Does line of sight supervision mean that as

13    a result of taking certain actions, they now have to

14    be seen at all times by a Southwest Key employee?

15        A    Let me read the whole thing.

16        Q    Sure.

17             (Witness reviews document.)

18             THE WITNESS:  Okay.  So what was the

19    question again?

20    BY MR. FENSTERMACHER:

21        Q    I'm trying to understand what "line of sight

22    supervision" means.

23        A    Right.  So what I responded earlier, line of

24    sight, I was explaining out of line of sight.

25        Q    Right.

Exhibit 2
Page 64

1    A    So line of sight supervision, that they have
2    to be within close proximity of a youth care worker.
3    Q    The line above that, it says, "No. 2, refer
4    to treatment team."
5         What's the treatment team?
6    A    The treatment team is pretty much composed
7    of the clinician case manager.  It could be the
8    program director or assistant program director, and
9    even shift leaders that come together and determine
10   an adolescent's case and talk about any potential
11   interventions that may take place.
12   Q    So depending on what occurred, they might
13   decide certain consequences?
14   A    Yes.
15   Q    The last question on this, if you take a
16   look to the column to your left of the column we were
17   just looking at which is the third column from the
18   left, first column from the right, under No. 3, it
19   says, "Staff must notify APD and PD."
20        Do you see that?
21   A    Yes.
22   Q    What does APD and PD stand for?
23   A    Program director and assistant program
24   director.
25   Q    Turning to Page 1356 under -- it's internal

Exhibit 2
Page 65

1    Page 90, there's a heading, "Runaways Prevention and

2    Risk Assessment.

3            Do you see that?

4       A    Yes.

5       Q    This is basically the policy for preventing

6    runaways; is that correct?

7       A    Yes.

8       Q    The first line says, "The minor is currently

9    under final order of deportation or exclusion."

10           Do you see that?

11      A    Yes.

12      Q    What does "final order of deportation or

13   exclusion" mean?

14           MR. TENBROECK:  Objection to the extent it

15   calls for a legal conclusion.

16   BY MR. FENSTERMACHER:

17      Q    In your experience, do you understand what

18   that term means?  What does that term mean to you?

19      A    Our kids don't usually go through a

20   deportation process, so that's what has me confused.

21      Q    Have you had kids that have been deported?

22      A    I would say --

23           MR. TENBROECK:  Same objection.

24           THE WITNESS:  Deported?  And I don't --

25   yeah, that's difficult.  I don't have the legal

Exhibit 2
Page 66

1    grounds to say that they were deported.

2    BY MR. FENSTERMACHER:

3        Q    Some kids sometimes voluntarily return to

4    their own country; correct?

5        A    Yes.

6        Q    So you don't know if any kids have

7    involuntarily returned to their own country under

8    your watch?

9        A    I don't recall.

10       Q    If you'd take a look -- actually,

11   Exhibit 10, generally, do you know what sources it is

12   based on?  For example, do you know if it is based on

13   federal rules?

14       A    Repeat the question.  I'm sorry.

15       Q    This document Exhibit 10, Unaccompanied

16   Minors Federal Programs Youth Care Services Manual,

17   do you know if it's written based on federal rules or

18   any other sources?

19       A    I would -- I didn't write the document, so

20   I'm not sure exactly what they referenced.

21       Q    Do you know who would be in charge of

22   writing a document like this at Southwest Key?

23       A    Marilyn Payan wrote this.

24       Q    I'm sorry.  Can you spell the last name?

25       A    P-a-y-a-n.

LINDA RYAN REPORTING (714) 225-9696

Exhibit 2
Page 67

1      Q    Okay.  And what is -- is that a female?

2      A    Yes.  Marilyn, like Marilyn Monroe.

3      Q    What's her position at Southwest Key?

4      A    She's no longer employed with Southwest Key.

5      Q    What was her position?

6      A    She was the Director of Youth Care Services.

7      Q    Who, in your opinion, would be more

8  knowledgeable about this document at Southwest Key?

9      A    The new Director of Youth Care Worker

10  Services is Diana Galliano.

11     Q    One last page in this document, the very

12  last page actually, 1366, if you would, please turn

13  there.  This lists a number of references.

14          Do you see that?

15     A    Yes, sir.

16     Q    Are you familiar with the first list there,

17  "Office of Refugee Resettlement Division of

18  Unaccompanied Children Services Policies and

19  Procedures Manual," are you familiar with that

20  document?

21     A    Yes.

22     Q    Would you have that in your files?

23     A    Probably computer based.

24     Q    And what about the "Nonviolent Crisis

25  Intervention Crisis Prevention and Intervention

Exhibit 2
Page 68

1    Manual?"

2        A    Yes.

3        Q    And you have that somewhere in your files as

4    well?

5        A    Yes.

6        Q    Same question with regard to state licensing

7    manuals?

8        A    Yes.

9        Q    Same question with "Southwest Key Programs

10   Operation Manual for Unaccompanied Minors program"?

11       A    Yes.

12       Q    Same question for "Residential Child And

13   Youth Care Professional Curriculum"?

14       A    I did not participate in that.

15       Q    What about "Verbeal Judo"?

16       A    To some extent.

17       Q    Okay.  Thanks.  Let's put that document

18   aside.  I'm going to show you a few more documents,

19   then we'll take a break.

20            I'm marking here as Exhibit 11 what is

21   titled "Operations Manual for Unaccompanied Minors

22   Programs."

23            Do you see that?

24       A    Yes.

25            (Exhibit 11 was marked by the CSR for

Exhibit 2
Page 69

1              identification and is attached hereto.)

2     BY MR. FENSTERMACHER:

3          Q     And do you recognize that document?

4          A     Yes.

5          Q     And this is a document you use in your

6     current role as regional executive director?

7          A     Yes.

8          Q     To your knowledge, it wouldn't have been the

9     same manual governing an Escondido facility?

10             MR. TENBROECK:  Objection.  Calls for

11     speculation.

12             THE WITNESS:  I don't recall what was

13     available at that time.

14     BY MR. FENSTERMACHER:

15          Q     It might have been a previous version of

16     this document?

17          A     Yes.

18          Q     One question with respect to this document,

19     on Page 1192, Bates number, which is internal

20     Page 12, if you would, take a look at that.

21          A     Uh-huh.

22          Q     If you look under Section 1.17, the second

23     sentence says, "The driver will be counted as part of

24     ratio unless the situation requires otherwise, i.e.,

25     client is a high-run risk."

1          Do you see that.

2     A    Uh-huh.

3     Q    When you were program director of El Cajon,

4  did you ever have any children that you considered a

5  high-run risk?

6     A    Yes.

7     Q    What would make you consider a child a

8  high-run risk?

9     A    They said that they wanted to run away.

10    Q    Okay.  And what extra precautions you would

11 you take with a high-run risk child at your

12 facilities.

13    A    We'd probably do a one-on-one line of sight.

14    Q    That's what we were talking about earlier?

15    A    Yes.

16    Q    So keeping them in sight with an employee at

17 all times?

18    A    Yes.

19    Q    Anything else?  Anything else that you have

20 seen done in the past for a high-run risk child?

21    A    No, that's pretty much it.  Not that I

22 recall.

23    Q    Okay.  I'm marking as Exhibit 12 what is

24 entitled "Employee Guidebook."

25          Do you see that?

**LINDA RYAN REPORTING (714) 225-9696**

Exhibit 2
Page 71

1          A     I know there were some discussions in

2     regards to that, but we didn't really pursue it

3     because the layout, this was not the best.

4          Q     Okay.  I'll mark another email here as

5     Exhibit 17.

6               (Exhibit 17 was marked by the CSR for

7               identification and is attached hereto.)

8     BY MR. FENSTERMACHER:

9          Q     Do you see this email from Mr. Harmon to you

10    in December 2013?

11         A     Yes, sir.

12         Q     Take a minute to look at this email.  It

13    looks like he's discussing with you and Ms. Rodriguez

14    what has to be done to the Mt. Vernon and Quality Inn

15    to convert them to Southwest Key facilities.

16              (Witness reviews document.)

17         A     Yes.

18         Q     Was the plan to fence in the entire motel

19    facilities and have it open as a Southwest Key

20    facility?

21         A     Yes.

22         Q     Why would you need a fence around the whole

23    facility?

24         A     Mt. Vernon is not the most desirable

25    community.

Exhibit 2
Page 72

1    Q    Okay.

2    A    It's drug and prostitution.  It's not the

3  best location, so that was the discussion of the

4  fence there.  And Quality Inn and Howard Johnson,

5  standard practice.

6    Q    Is it partially because the doors open to

7  the outside and you want to keep all the kids in the

8  facility rather than, say, wandering off?

9    A    Yes.

10   Q    Are the Quality Inn and Howard Johnson in

11 better neighborhoods than Mt. Vernon?

12   A    It's two blocks away, but it's a world of

13 difference.

14   Q    Really?

15   A    Yes.

16   Q    Just less criminal element around and that

17 kind of thing?

18   A    I would imagine so.

19   Q    There is a reference to restaurants.  Do you

20 recall a plan to either lease or buy the restaurants

21 neighboring these motels?

22   A    Yes, sir.

23   Q    What was the plan there?

24   A    Utilize it as a cafeteria place for the

25 adolescents.

Exhibit 2
Page 73

1    the representative of CCLD.

2        Q     CCLD?

3        A     Yeah.

4        Q     Do you know what the end results of the

5    communication with licensing were?  For example, did

6    they ultimately relent and say they would consider

7    approving a license, or did they say they still

8    weren't sure?

9              Do you know?

10       A     Yeah, after some dialogue, they said that

11   they would work with us.

12       Q     But to be clear, no normal licensing

13   application was actually submitted at any time for

14   the motel sites; right?

15       A     Right.  You would need, what do you call it,

16   fire inspections and all these different things to

17   submit the application.

18       Q     And just never got that point with respect

19   to the motel sites?

20       A     Yes, sir.

21       Q     I'm marking a document as Exhibit 21.  This

22   document I'm looking at here under B, it refers to

23   555 North Center City Parkway.  And my understanding

24   is that is one of the motel sites?

25       A     Mt. Vernon.

149

Exhibit 2
Page 74

1          (Exhibit 21 was marked by the CSR for

2          identification and is attached hereto.)

3    BY MR. FENSTERMACHER:

4      Q    What is this document?

5      A    It's just a general report, the possibility

6    of services here at this location.

7      Q    Would this have been prepared by Southwest

8    Key?

9      A    Yes.

10     Q    Who was this prepared for?

11     A    I'd imagine I might have prepared this

12   document and submitted it to Alexia.

13     Q    So it might have been an internal report

14   prepared by you?

15     A    Yes.

16     Q    And under A in bold, it says -- well, under

17   the third line, it says, "SWK is proposing to provide

18   basic shelter care and other related services to

19   unaccompanied alien children, UAC, to the proposed

20   new shelter in Escondido."

21          Do you see that?

22     A    Yes, sir.

23     Q    So these proposed facilities in Escondido at

24   the motels, you internally refer to them as shelters?

25     A    Not necessarily.  I was using -- in this, I

```
1    STATE OF _____)
                                ) ss.
2    COUNTY OF _____)

3

4

5         I, the undersigned, say that I have read the

6    foregoing deposition; and I declare, under penalty of

7    perjury under the laws of the State of California, that

8    the foregoing is a true and correct transcript of my

9    testimony contained therein.

10        EXECUTED this _____ day of _____,

11   2016, at _____.

12

13

14

15   _____
     ISMAEL AVILEZ
16

17

18

19

20

21

22

23

24

25
```

255

Exhibit 2
Page 76

1

2

3        I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby

5   certify:

6        That the foregoing proceedings were taken

7   before me at the time and place herein set forth;

8   that the witness in the foregoing proceedings, prior

9   to testifying, was placed under oath; that a verbatim

10  record of the proceedings was made by me using

11  machine shorthand which was thereafter transcribed

12  under my direction; further, that the foregoing is an

13  accurate transcription thereof.

14        I further certify that I am neither

15  financially interested in the action nor a relative

16  or employee of any attorney of any of the parties.

17        IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated:  May 24, 2016

21

22          *Denise T. Johnson*

23          Denise T. Johnson
            CSR No. 11902

24

25

256

Exhibit 2
Page 76.1