UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


SOUTHWEST KEY PROGRAMS, INC., )
                              )
          Plaintiff,          )
                              )
     vs.                      )  No. 3:15-cv-0115-H(BLM)
                              )
CITY OF ESCONDIDO,            )
                              )
          Defendants.         )
_____)


PMK 30(B)(6) DEPOSITION OF ALEXIA RODRIGUEZ

San Diego, California

Tuesday, June 28, 2016

Volume 1


Reported by:
LINDA SILVER RYAN
CSR No. 9915
JOB No. 12219

1

Exhibit 3
Page 77

1                UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF CALIFORNIA

3

4    SOUTHWEST KEY PROGRAMS, INC., )
                                   )
5                 Plaintiff,       )
                                   )
6         vs.                      )  No. 3:15-cv-0115-H(BLM)
                                   )
7    CITY OF ESCONDIDO,            )
                                   )
8                 Defendants.      )
     _____)

9

10

11

12

13

14

15          Deposition of ALEXIA RODRIGUEZ, taken

16     on behalf of Defendants, at 4401 Eastgate

17     Mall, San Diego, California, beginning at

18     10:00 a.m. and ending at 6:32 p.m. on

19     Tuesday, June 28, 2016, before LINDA SILVER

20     RYAN, Certified Shorthand Reporter No. 9915.

21

22

23

24

25

2

Exhibit 3
Page 78

1   APPEARANCES:

2

3        For Plaintiff:

4            ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES
             BY:  LIZA CRISTOL-DEMAN, ESQ., ESQ.
5            P.O. Box 686
             San Diego, California 92138-7131
6            (650) 870-0141

7        For Defendant:

8            RUTAN & TUCKER, LLP
             Attorneys at Law
9            BY:  MICHAEL RUBIN, ESQ.
             BY:  ALAN B. FENSTERMACHER, ESQ.
10           611 Anton Boulevard
             Suite 1400
11           Costa Mesa, California 92626
             (714) 641-5100

12

     Also Present:

13
             MICHAEL McGUINNESS - City of Escondido
14

15

16

17

18

19

20

21

22

23

24

25

3

Exhibit 3
Page 79

1    A    2004.

2    Q    Okay.  Keep going.

3    A    General counsel after about five months of being

4    there, and then about -- so where would that put us, 2006?

5    Around -- I'm sorry, so 2004 to 2006 I primarily did

6    general counsel work and then around 2006 I was asked to

7    be chief operations officer, which is essentially the role

8    that I'm in right now, but our titles switched to vice

9    presidents as opposed to chiefs at some point along the

10   line, maybe about five or six years ago.

11   Q    Change in title, but not in scope of what you do?

12   A    No, sir.

13   Q    Anything else?

14   A    That's it.

15   Q    How did your activities in things that you do

16   change when you became chief operations officer from those

17   that they were when you were general counsel?

18   A    So I gave up responsibility of managing the legal

19   department, and we hired another general counsel to take

20   my place.

21   Q    Who is that?

22   A    Her name is Rachel Luna.  And I focused on

23   operations of the unaccompanied minor shelters moving

24   forward.

25   Q    And that was in 2006?

Exhibit 3
Page 79.1

1      A     Approximately.

2      Q     Did your location of your office change?

3      A     No, sir.

4      Q     Did the people you were in charge of change?

5      A     Yes, it did.

6      Q     How did that change?

7      A     So I went from managing two lawyers and a legal

8   assistant to managing everyone that works in the

9   unaccompanied minor programs.  So it went from maybe

10  managing three people to managing maybe 500 people.

11     Q     As the chief operations officer, what are your

12  responsibilities and duties at Southwest Key?

13     A     What were they?  Because I'm vice president.

14     Q     Well, you told me that's just a change in title.

15     A     It is.

16     Q     So can I use those interchangeably?

17     A     You can, it just --

18     Q     So I don't have to ask them twice?

19     A     It just throws me off.  Yes, that's fine.

20           So what are they?  My responsibility is oversight

21  of the -- all of the unaccompanied minor shelters

22  Southwest Key runs.  So everything from ensuring best

23  practices in the way we serve kids, to hiring, making sure

24  the right staff is hired, strategic planning for those

25  programs, interfacing with ORR, interfacing with state

Exhibit 3
Page 79.2

1   licensing entities, representing this part of the company
2   at our board of directors meetings.
3        Q    I take it before then as general counsel most of
4   your activities were focused on the legal operations of
5   Southwest Key?
6        A    All of it was.
7        Q    100 percent?
8        A    Correct.
9        Q    And after 2006, then your position is as chief
10  operation officer and a later change in title to vice
11  president.  How much of the percentage of your work was
12  focused on the legal operations?
13       A    So the legal work that I do is probably less than
14  5 percent currently and has been for the last ten years.
15       Q    Is it mostly just overseeing what the legal
16  operations do?
17       A    It's not oversight.  It's actual legal work.  For
18  instance, the termination of an employee, that kind of
19  thing, employment law.
20       Q    Anything else?
21       A    Mostly it involves terminations from time to
22  time.  If the legal department gets busy, I might be asked
23  to help.  It's pretty rare.
24       Q    Can you think of anything else that falls within
25  that 5 percent?

29

Exhibit 3
Page 79.3

1      A     Okay.

2      Q     The unaccompanied minors in the Southwest Key

3  facilities and how the facilities are run.  And I take it

4  as to the three facilities she is in charge of, she is

5  qualified to testify as to that?

6      A     Yes.

7      Q     You have been designated to testify about the

8  operation of Southwest Key facilities and the lives of the

9  kids in the Southwest Key facilities.

10     A     Yes.

11     Q     And you're obviously qualified to testify about

12 that?

13     A     Yes.

14     MS. CRISTOL-DEMAN:  I'm just going to make one

15 objection or caveat, which is we did serve objections to

16 the notice, and I know that some of the notice topics were

17 actually modified.  So just subject to our objections and

18 the modifications that were made by the agreement of

19 counsel, yes, she is deemed the person -- been deemed the

20 person to testify about those topics.

21     MR. RUBIN:  And I have those objections if we need to

22 refer to them at all.  Okay?

23     MS. CRISTOL-DEMAN:  Great.

24 BY MR. RUBIN:

25     Q     As to those three facilities, is she as qualified

Exhibit 3
Page 79.4

1   as you to testify about the operation of them and the

2   lives of kids that are unaccompanied minors in those three

3   facilities?

4        MS. CRISTOL-DEMAN:  Objection.  The question is

5   overbroad.  Vague and ambiguous.  Might call for

6   speculation too.

7        THE WITNESS:  I would think so.

8   BY MR. RUBIN:

9        Q    As to the San Diego facilities, is she qualified

10  to testify about Southwest Key's procedures and policies?

11       MS. CRISTOL-DEMAN:  Objection.  Overbroad.

12       THE WITNESS:  Yes.

13  BY MR. RUBIN:

14       Q    What about the ORR's policies and procedures as

15  they relate to those three facilities?

16       A    Yes.

17       Q    When I speak of ORR, do you know what I'm

18  speaking of?

19       A    The Office of Refugee Resettlement.

20       Q    And I take it as to the San Diego facilities, she

21  would be as qualified to testify about those topics as

22  you?

23       MS. CRISTOL-DEMAN:  Objection.  Overbroad.  Vague and

24  ambiguous.  Calls for speculation.

25       THE WITNESS:  Yes.

1  BY MR. RUBIN:

2      Q    Ismael Avilez, if I asked the same questions as

3  to Ismael Avilez, would your answers still be yes on

4  those?

5      MS. CRISTOL-DEMAN:  Same objections.

6      THE WITNESS:  Not for the San Diego programs.

7  BY MR. RUBIN:

8      Q    As to what programs?

9      A    The programs that he oversees.

10     Q    Which were?

11     A    El Paso, San Antonio and Pleasant Hill,

12 California.

13     Q    In 2014?

14     A    Oh, over his own program in El Cajon, yes.

15     Q    So as to all of those programs, he would be as

16 qualified to testify as you about the operations of the

17 Southwest Key facilities?

18     MS. CRISTOL-DEMAN:  Objection.  Overbroad.  Vague and

19 ambiguous.

20     THE WITNESS:  Yes.

21 BY MR. RUBIN:

22     Q    And Southwest Key's policies and procedures as to

23 those programs?

24     MS. CRISTOL-DEMAN:  Same objections.

25     THE WITNESS:  Yes.

45

Exhibit 3
Page 79.6

1      MS. CRISTOL-DEMAN:  Objection.  Vague as to time.

2    BY MR. RUBIN:

3      Q    Well, currently.

4      A    For this fiscal year, it's 35 days.

5      Q    Do you know what it was in 2014?

6      A    My recollection it was, I believe, about 27 days.

7      Q    And what causes them to end their stay at your

8    facility?

9      A    So a couple of things can happen.  One, they are

10   unified with a family member or a friend of the family in

11   the community, in the United States.  Or they may be

12   repatriated back to their country of origin, or they may

13   go to foster care, or they can age out of our system.

14     Q    Okay.  And they age out at age 18?

15     A    That's right.

16     Q    If they age out, what happens to them?

17     A    They go to an adult immigration detention

18   facility.

19     Q    Where would that be?

20     A    I don't know, sir.  Just depends on each case.

21     Q    Now, in a given year, say since October 2015, how

22   many of the unaccompanied alien children aged out and went

23   to an adult detention facility?

24     A    I don't know off the top of my head.

25     Q    Could you say in terms of whether it was over

56

Exhibit 3
Page 80

1  1,000?

2      A    I couldn't say.  What I can say it's a pretty

3  small amount compared to our reunifications.  Those are

4  the vast majority -- that's the way most of the children

5  leave our shelters is through the reunification process.

6      Q    Reunification is a reunification of a family --

7      A    Or friend of family.

8      Q    -- member or friend of family here in the United

9  States?

10      A    That's correct.

11      Q    And then custody would be transferred to that

12  family or friend of family at that point?

13      A    Yes, sir.

14      Q    And I take it that there would be custodial

15  obligations on the part of that family or friend of family

16  that Southwest Key was performing previously?

17      A    When the children were in our shelter?

18      Q    Yes.

19      A    Yes, sir.  We would take care of all of the

20  children's needs when they're with us.

21      Q    Now, when a child ages out, how does the transfer

22  occur from your Southwest Key facility to the adult

23  detention facility?

24      A    So I have never personally been involved in an

25  age out, but my understanding is that ICE comes to pick

57

Exhibit 3
Page 81

1  them up and then takes them to one of their detention

2  facilities.

3      Q    ICE is who?

4      A    Immigration and Customs Enforcement.

5      Q    I think that's correct.

6      A    Thank you.  I passed the test.

7      Q    That's an arm of the federal government, correct?

8      A    That's correct, it's a branch of the Department

9  of Homeland Security.

10     Q    When children arrive at your facility, they come

11  in the custody of ICE at that time?

12     A    So again, I've never been there when they have

13  arrived, but my understanding is that the border patrol

14  brings them, which is -- that's okay.

15     Q    The border patrol, describe what or who the

16  border patrol is.

17     MS. CRISTOL-DEMAN:  I'll object to the extent it calls

18  for speculation.  It calls for legal conclusion.  It's

19  probably outside of the scope of the notice.

20         You can answer if you know.

21     THE WITNESS:  I really don't know.  They're part of

22  the Department of Homeland Security is what I can say.

23  BY MR. RUBIN:

24     Q    Again, an arm of the federal government?

25     A    Yes, sir.

LINDA RYAN REPORTING (714) 202-5853

Exhibit 3
Page 82

1     Q     A policing arm of the federal government?

2     A     Correct.

3     Q     And those children that age out and go to an

4  adult detention facility, are you aware of any of the

5  circumstances of the transfer or how that occurs, other

6  than that ICE comes to get them?

7     A     No, sir.

8     Q     Do you have any knowledge of any of the adult

9  detention facilities that any of these children are

10 transferred to after they leave your Southwest Key

11 facility?

12    A     No, I do not.

13    Q     So you don't know if it's in another state, if

14 it's nearby, anything like that?

15    A     I don't.

16    Q     And you don't track these children after they

17 leave Southwest Key facilities and go to an adult

18 detention facility?

19    A     We do not.

20    Q     Southwest Key does not run any adult detention

21 facilities, I take it?

22    A     No, sir.

23    Q     So you don't have any experience with that?

24    A     No, sir.  Well, who, Southwest Key?  Right.  I'm

25 sorry.  We do not.

Exhibit 3
Page 83

1   and that's pretty much it.

2        Q    Does the federal government, ICE or ORR or any

3   other branch of the federal government participate in the

4   transfer of custody?

5        A    Not in the moment that the transfer is happening.

6   They approve the transfer, ORR does.

7        Q    But they don't have any personnel on-site present

8   at that transfer?

9        A    No, sir.

10        Q    Does the transfer occur at the Southwest Key

11   facility?

12        A    Very rarely.

13        Q    Where does it occur?

14        A    Typically at the airport.  So typically we would

15   fly a child from our shelter to wherever the parent lives,

16   and that's where it occurs.

17        Q    Okay.  And when you say "we would fly the child

18   from our shelter to wherever" the child's family, parent

19   or friend lives, do you mean that you accompany the child?

20        A    One of our staff members.  So, yes, typically.

21   As the years have progressed -- we used to fly every child

22   at one point, but now those rules have changed back and

23   forth.  So now if the child is over a certain age ORR may

24   allow them to fly alone.  But if they're under a certain

25   age --

Exhibit 3
Page 84

1   escorted off and does not release that child to anybody

2   except who the paperwork designates to.  This person, that

3   person has to present their ID, which is the parent.

4          So we pay for the special -- or we don't pay for

5   it; the family pays for that special designation, and the

6   family pays for the plane.

7   Q    So if they're going to be unaccompanied, that is

8   the procedure that is followed?

9   A    Correct.

10  Q    I take it somebody from Southwest Key would be

11  with the child until they are placed on the plane where

12  they now have that procedure that somebody from the

13  airlines has to get a signature before that child is

14  released to anybody else?

15  A    That's correct.

16  Q    And then when the signature is produced, somebody

17  else comes who identifies themselves as the person to pick

18  up that child pursuant to the documents that have been

19  provided, they have to sign, and then they can take

20  custody of the child?

21  A    That's right.

22  Q    What about when a child is -- an unaccompanied

23  alien child is transferred back to their country of

24  origin, what is the procedure for that?

25  A    I can speak in general terms.  Again, I've never

Exhibit 3
Page 85

1    witnessed a repatriation take place, but it would begin

2    with an order of removal from an immigration judge, and

3    then our program works with the consulate of that country

4    of origin to set up a flight for them to return.  I'm

5    unclear as -- I don't know if our personnel -- our

6    Southwest Key personnel takes them to the airport to get

7    on the flight, or if the consulate comes to pick up the

8    child.  I don't know that detail.  But I do know that

9    Southwest Key worked with the consulate, and they set up

10   the flights for the children.

11        Q    When this happens, is that a voluntary transfer?

12   Is this something that is chosen by the child?

13        A    It could be a voluntary departure.  A child could

14   ask for voluntary departure, or the judge could say -- a

15   child could pursue some sort of immigration relief and get

16   denied and the judge orders them removed.

17        Q    So in that instance, it would be involuntary?

18        A    Um-hum.

19        MS. CRISTOL-DEMAN:  Is that a "yes"?

20        THE WITNESS:  Yes, sir.

21   BY MR. RUBIN:

22        Q    They're not allowed then to stay in the United

23   States?

24        A    Involuntarily, no, sir.  If they are ordered

25   removed, they're not allowed to stay in the United States.

**LINDA RYAN REPORTING (714) 202-5853**

Exhibit 3
Page 86

1    Q    So sometimes they ask you for more beds --

2    A    Um-hum.

3    Q    -- saying that they know they have an increasing

4    need, so they ask you --

5    A    Right.

6    Q    -- and sometimes you're anticipating their needs,

7    so you start looking proactively --

8    A    That's correct.

9    Q    -- for facilities?

10    MS. CRISTOL-DEMAN:  Remember, let him finish;

11    otherwise, there will be lots of interruptions in the

12    transcript.

13    THE WITNESS:  Got it.

14    MS. CRISTOL-DEMAN:  It just gets messy.

15    BY MR. RUBIN:

16    Q    In 2014 when you started looking in Escondido for

17    a facility, which of the two situations did that

18    represent?

19    A    The second.  ORR asked us to look for facilities.

20    Q    We'll get into that in a little bit more detail

21    later on.  Okay?

22       Now, looking again at your chart, Exhibit 2,

23    looking at after that September 2010 blip of a loss of 46

24    beds, beds seem to increase until we get to October of

25    2014 through September 2015 --

LINDA RYAN REPORTING (714) 202-5853

Exhibit 3
Page 87

1       A      Um-hum.

2       Q      -- and then beds decreased by 567.  Do you see

3  that?

4       A      I do.

5       Q      Now, what was the cause for that decrease in the

6  number of beds that changed from prior years?

7       A      So there was two primary causes.  One was there

8  was no need for what we call licensed -- variance through

9  licensing in Texas.  I can explain that if you would like

10  me to.

11       Q      Yes.

12       A      So the state of Texas allows us to increase our

13  licensed bed capacity at our shelters when there is a

14  pressing humanitarian need to do so.  In that fiscal year,

15  2015, there were no variance beds needed.  So that 567

16  represents not having those beds.

17              The other part of the equation is that we had

18  a -- we have a program in downtown Phoenix, Casa Phoenix,

19  that is licensed for 420 beds.  That fiscal year they

20  asked us to only have 50 beds because at that time they

21  didn't need the rest, but we -- so let me take it back.

22              They asked us to have 50 beds during one part of

23  the year and then were going to be prepared to be a surge

24  site to go up to the 420.

25       Q      So the number of children decreased dramatically

1   during that period of time --

2       A    Coming into --

3       Q    -- that came into --

4       MS. CRISTOL-DEMAN:  Objection.  The question is vague

5   and ambiguous.

6       MR. RUBIN:  It is.  Let me redo that one.  Okay?

7   Thank you.

8       Q    When it says beds increased, or when they're in

9   parentheses they decreased, does that mean that you were

10  not authorized to have the beds?

11      A    It means that at the beginning of the fiscal year

12  of 2015 we had 567 less beds that ORR purchased, quote

13  unquote, from Southwest Key starting the year.

14      Q    So the beds didn't disappear; they might have

15  physically been present there, but they weren't on the ORR

16  list as ones they were paying for?

17      A    That's correct.  We had the same number of

18  programs going into fiscal year 2015 that we had in 2014.

19      Q    So they were essentially empty beds?

20      A    That is correct.

21      Q    Now, was it your understanding that it was

22  because ORR didn't have the demand to fill those beds so

23  they didn't want to pay for them?

24      MS. CRISTOL-DEMAN:  Objection.  Calls for speculation.

25      THE WITNESS:  So that's my understanding.  The

Exhibit 3
Page 89

1    variances weren't needed.  And so that took up part of

2    those beds.  And then, yes, there just wasn't a need for

3    them.

4    BY MR. RUBIN:

5        Q    That ORR had?  Okay.  The demand wasn't there?

6        A    Yes, sir.

7        Q    Now, did Southwest Key attempt to negotiate with

8    ORR to try to increase the number of beds they were paying

9    for during that period?

10       A    Not that I recollect.

11       Q    Okay.  So if they say we're going to decrease the

12   beds we're paying for so you're going to have empty beds,

13   Southwest Key just accepts that and doesn't try to

14   persuade ORR to change their mind?

15       A    Part of it is not within ORR's purview.  The

16   licensed to variance beds are an exception that the State

17   of Texas grants us.  They're extra beds.  So going back to

18   what I said, what we are concerned about is do we get to

19   keep every program moving forward.

20            We did get to keep every program.  If ORR had

21   said there is no need for beds and we're going to cut a

22   program and close it down, then we would fight very

23   strongly to keep that program open, but that didn't

24   happen.

25       Q    When you say "program," you mean a facility?

71

Exhibit 3
Page 90

1    beds, do they first go to a competitor to see if they have

2    licensed beds available rather than trying to have you use

3    the extra powers in Texas to provide beds beyond the

4    licensed amount?

5        MS. CRISTOL-DEMAN:  Objection.  Calls for speculation.

6        THE WITNESS:  I can't say what ORR does.  But what I

7    can tell you is that from what I have been told what they

8    do, they are tracking their beds nationwide, and the only

9    reason we would be requested to ask for a variance is

10   because they're at capacity nationwide or they're getting

11   to capacity nationwide.

12   BY MR. RUBIN:

13       Q    You refer to "capacity nationwide."  Is it fair

14   to say that ORR assesses their demand for beds in terms of

15   their nationwide needs as opposed to regionwide needs?

16       MS. CRISTOL-DEMAN:  Objection.  Calls for speculation.

17       THE WITNESS:  I don't know how they do that.

18   BY MR. RUBIN:

19       Q    You mentioned that ORR may come to you and say

20   the need for beds is increasing, we have an increasing

21   number of unaccompanied alien children that we have to

22   accommodate.  When they do that, do they tell you where

23   they need those beds?

24       A    No, they do not.

25       Q    They just say we need capacity somewhere in the

Exhibit 3
Page 91

1   United States, can you provide it?

2        A    That's my experience with them.

3        Q    So it's your choice where you provide it?

4        A    That is correct.

5        Q    You can provide it in Texas as well as Orange

6   County or Escondido if you wanted to as far as ORR is

7   concerned?

8        A    That's correct.

9        Q    So where you provide it is purely a matter of

10  choice of Southwest Key?

11       MS. CRISTOL-DEMAN:  I'm going to object to the

12  question.  It's vague and ambiguous.  Maybe argumentative.

13       THE WITNESS:  It has to be approved.  So we get to put

14  any proposal that we want in front of ORR, and they get to

15  decide if they want to buy it.

16  BY MR. RUBIN:

17       Q    Okay.  As part of their approval process, is

18  their approval process primarily one of whether the

19  facility is adequate as opposed to is this in the right

20  geographical area?

21       MS. CRISTOL-DEMAN:  Objection.  Calls for speculation.

22       THE WITNESS:  Yeah, I'm not sure what their criteria

23  is.  I know they ask us for the budgets and they ask us

24  for photos of the facility and --

25  BY MR. RUBIN:

Exhibit 3
Page 91.1

1    Q    Okay.  But you go through a lot of trouble --

2  once they say we have a need for more facilities, you go

3  through a lot of trouble to find a facility that you think

4  might be adequate, correct?

5    A    That's correct.

6    Q    And I assume that you would not go to an area

7  that you think would not be suitable for ORR since you're

8  going through the trouble to locate a facility?

9    A    Quite honestly, we don't evaluate it that way.

10  We evaluate whether or not it makes sense from us -- for

11  us on an operational level to put a program there.

12    Q    Okay.  So it's basically the location is

13  determined primarily by Southwest Key, though ultimately

14  has to be approved by ORR?

15    A    That's correct.

16    Q    Okay.  And as far as you're concerned, they're

17  just as likely to approve a Texas location as an Escondido

18  or San Diego location as long as it's otherwise suitable?

19    MS. CRISTOL-DEMAN:  Objection.  Calls for speculation.

20    THE WITNESS:  I would assume so because they approved

21  the Escondido location, and they have also approved Texas

22  locations.

23  BY MR. RUBIN:

24    Q    You didn't go to Escondido to find a location in

25  2014 because ORR was looking for a Southern California

Exhibit 3
Page 92

1    location?

2          A     No, sir.

3          Q     You did it because that would have been in

4    Southwest Key's view a good place to locate a facility,

5    correct --

6          A     That's correct.

7          Q     -- from its own operational point of view?

8          A     That's correct.

9          Q     Not from the ORR's point of view?

10         A     That's correct.

11         Q     Okay.  So if for some reason you found you

12   couldn't go in Escondido as far as a Southwest Key

13   facility, and you had a location in Texas as an alternate,

14   that could serve as well from ORR's perspective?

15         A     I didn't understand the question.

16         Q     From ORR's perspective, if you started looking at

17   Escondido and you found that that wasn't a suitable

18   location for some reason, from ORR's perspective, you

19   could look in Texas and it would suit as well, as long as

20   it's otherwise proper?

21         MS. CRISTOL-DEMAN:  I'm going to object to the

22   question as vague and ambiguous.  Calling for speculation,

23   and it's an incomplete hypothetical.

24         THE WITNESS:  I would assume so.

25   BY MR. RUBIN:

Exhibit 3
Page 92.1

1     Q     Now, is there a bid process that occurs with ORR?

2    When they indicate that there is a demand for more beds,

3    how do companies such as Southwest Key respond to that?

4    Is there some kind of competitive process to fill that

5    need, or is it done by some different process?

6     A     During the time of influx?

7     Q     Yes.

8     A     There is not necessarily -- I can give you a

9    concrete example.  For instance, in reference to the case

10   at hand, in 2013, at the end of 2013 ORR had a conference

11   call with all of its providers asking for increased bed

12   capacity, and asking for proposals from whoever wanted to

13   put it in.  So in that way, I guess it's competitive.  It

14   was an open call for proposals.  And that's how that got

15   started.

16          In other years they have asked us as a current

17   vendor do we have the capacity to bring on a new program.

18   I don't know if they have also asked other vendors.  But

19   it was a phone call to us, "Do you have capacity to open

20   new programs?"

21    Q     Okay.  When you indicate they asked you, "Do you

22   have capacity to open new programs?" is this something

23   that is done in writing, or is it just like phone calls,

24   or how does that occur?

25    A     Mostly it's phone calls.

Exhibit 3
Page 92.2

1   testified to that.

2       THE WITNESS:  Is your question did we open up any

3   facilities between October 2014 and September 2015?

4   BY MR. RUBIN:

5       Q    Let's start with that, yeah.

6       A    No, not that I -- give me a second, I'm trying to

7   think in my mind.  Not that I recollect, no, we didn't.

8       Q    Did they authorize any new facilities during that

9   period of time?

10      A    No, sir.

11      Q    Yet you feel though the demand was decreasing

12  that ORR had, they would have paid for 96 more beds in

13  Escondido if you had permits to open that up in October

14  2014?

15      A    I strongly feel that way because that's what they

16  did with all of our programs with the exception of Casa

17  Phoenix.

18      Q    Besides what you already testified to, is there

19  any other information that would support that belief that

20  you have?

21      A    Well, no, because you're talking about a

22  hypothetical situation.  Other than we gave you -- you see

23  the budgeted amounts, I mean, we've turned over discovery

24  in terms of what capacity we had in 2013, 2014, 2015, and

25  as it shows you, since we started running the programs, we

93

Exhibit 3
Page 93

1   of the unaccompanied alien children program?

2        A    That's right.

3        Q    What about the unaccompanied alien children

4   program, besides you and Geraldo, anybody else that

5   regularly communicates with the federal government?

6        A    From Southwest Key?

7        Q    Yes.

8        A    Lots of people do.

9        Q    Okay.

10       A    So Fred, members of Fred's team, my executive

11  management team contacts and works closely with some of

12  ORR's representatives on policy issues.  All of the

13  program directors in the field and assistant program

14  directors have regular contact with the federal

15  government, even like department heads, like lead case

16  managers, lead clinicians would be staffing maybe more

17  complex cases with the federal field specialist.

18       Q    So if I limited it to location of facilities,

19  would that pretty much be limited to you and Geraldo?

20       A    And then Fred with the budgets.

21       Q    Okay.  Has ORR ever told Southwest Key that they

22  need a facility in a specific city?

23       A    I don't recollect that.

24       Q    Specific county?

25       A    Not that way, no.  I mean, they have brought

Exhibit 3
Page 94

1  facilities forward to us of which they've asked us to

2  consider operating, and we said no for different reasons.

3  But they've -- I don't recollect them ever saying "we want

4  a facility in X city in X state."

5      Q    Okay.  Give me an example of one that you said no

6  for some reason.

7      A    They found -- during the summer of 2014 they

8  found a facility in -- I believe it was in Colorado

9  Springs, and we just didn't think it was a good place for

10  kids.

11      Q    So they located it?

12      A    It was a federally owned government building.

13      Q    Okay.  How many beds would that --

14      A    I have no idea.  It was an office building, and

15  it needed like work and conversion.

16      Q    Anybody else take a look at it, any of your

17  competitors that you know?

18      A    I would have imagined they would have asked

19  several other folks.  I don't know.

20      Q    Do you know if it became a facility at some

21  point?

22      A    It did not.

23      Q    Once you identify a potential facility -- well,

24  let me back up and just ask a more general question.

25           Can you describe the process that you go through

130

Exhibit 3
Page 95

1    than their policies are minimal.  And so, yes, to a

2    certain extent they do, but we enhance those policies by

3    adding best practice, our own policies, our own

4    procedures.  So, yes, they dictate the bare minimum and

5    then we go from there.

6    BY MR. RUBIN:

7        Q     Well, for instance, say a child runs away -- does

8    that ever happen at a Southwest Key facility?

9        A     It does.

10       Q     And do their policies indicate what you do in

11   that circumstance?

12       A     They indicate at a minimal level what we need to

13   do.

14       Q     What do they say?

15       A     That we need to notify them.  We need to submit

16   an SIR and notify the local authorities.

17       Q     The police?

18       A     Sure.

19       Q     So the police then apprehends the child and

20   brings the child back into the custody of either Southwest

21   Key or the federal government, correct?

22       A     Correct.

23       Q     Okay.  And they have policies on what kind of

24   touching can occur with a child.

25       A     Basic, yes.

Exhibit 3
Page 96

1    that their requirements are met?

2        A    That is correct.

3        Q    And you can be stricter than their requirements,

4    but you can't be more lax than their requirements?

5        A    That is correct.

6        Q    And their monitoring occurs how often?

7        A    That's up to them, and it's just based on a

8    schedule of which I have no knowledge.  I don't know how

9    they put together their monitoring schedule.

10        Q    Okay.  Does somebody come out at least once a

11    month?

12        A    So their federal field specialists, the locals

13    are there weekly.

14        Q    Weekly?

15        A    Oh, yes, and multiple times a week, depending on

16    the program and how many federal field specialists are in

17    an area.  The monitoring team comes out maybe once a year,

18    maybe once every other year.

19        Q    Okay.  The team comes out once a year, once every

20    other year, but their specialists are there weekly?

21        A    Yes, typically weekly.

22        Q    What are they monitoring?

23        A    Well, they participate in case staffing, so

24    they're monitoring case files, they're monitoring the

25    progress of the child in the program, or are they moving

Exhibit 3
Page 97

1   STATE OF _____ )
                                 )  ss.
2   COUNTY OF _____ )

3

4

5

6

7

8

9        I, the undersigned, say that I have read the foregoing

10   deposition, and I declare, under penalty of perjury under

11   the laws of the State of California, that the foregoing is

12   a true and correct transcript of my testimony contained

13   therein.

14        EXECUTED this _____ day of _____,

15   2016, at _____.

16

17

18        _____
          ALEXIA RODRIGUEZ
19        Volume 1 - PMK 30(b)(6)

20

21

22

23

24

25

                                                    284

Exhibit 3
Page 98

1

2

3      I, the undersigned, a Certified Shorthand Reporter of

4    the State of California, do hereby certify:

5      That the foregoing proceedings were taken before me at

6    the time and place herein set forth; that any witnesses in

7    the foregoing proceedings, prior to testifying, were

8    placed under oath; that a verbatim record of the

9    proceedings was made by me using machine shorthand which

10   was thereafter transcribed under my direction; further,

11   that the foregoing is an accurate transcription thereof.

12     I further certify that I am neither financially

13   interested in the action nor a relative or employee of any

14   attorney of any of the parties.

15     IN WITNESS WHEREOF, I have this date subscribed my

16   name.

17

18   Dated: _____7/15/16_____

19

20

21   LINDA SILVER RYAN
     CSR No. 9915

22

23

24

25

285

Exhibit 3
Page 99

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


SOUTHWEST KEY PROGRAMS, INC., )
                              )
          Plaintiff,          )
                              )
     vs.                      )   No. 3:15-cv-0115-H(BLM)
                              )
CITY OF ESCONDIDO,            )
                              )
          Defendants.         )
_____)


DEPOSITION OF ALEXIA RODRIGUEZ

San Diego, California

Wednesday, June 29, 2016

Volume 2  - Individual Capacity


Reported by:
LINDA SILVER RYAN
CSR No. 9915
JOB No. 12223

**LINDA RYAN REPORTING (714) 202-5853**

Exhibit 3
Page 100

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF CALIFORNIA

3

4    SOUTHWEST KEY PROGRAMS, INC., )
                                   )
5                  Plaintiff,      )
                                   )
6         vs.                      )  No. 3:15-cv-0115-H(BLM)
                                   )
7    CITY OF ESCONDIDO,            )
                                   )
8                  Defendants.     )
     _____)

9

10

11

12

13

14

15          Deposition of ALEXIA RODRIGUEZ, Vol. 2,

16      taken on behalf of Defendants, at 4401

17      Eastgate Mall, San Diego, California,

18      beginning at 9:17 a.m. and ending at 2:36

19      p.m. on Wednesday, June 29, 2016, before

20      LINDA SILVER RYAN, Certified Shorthand

21      Reporter No. 9915.

22

23

24

25

Exhibit 3
Page 101

```
 1    APPEARANCES:

 2

 3        For Plaintiff:

 4            ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES
              BY:  LIZA CRISTOL-DEMAN, ESQ., ESQ.
 5            P.O. Box 686
              San Diego, California 92138-7131
 6            (650) 870-0141

 7

          For Defendant:
 8
              RUTAN & TUCKER, LLP
 9            Attorneys at Law
              BY:  ALAN B. FENSTERMACHER, ESQ.
10            611 Anton Boulevard
              Suite 1400
11            Costa Mesa, California 92626
              (714) 641-5100
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**LINDA RYAN REPORTING (714) 202-5853**

Exhibit 3
Page 102

1   please let me know.

2        A    Okay.

3        Q    And there is no reason today that you wouldn't be

4   able to accurately and completely testify, drugs or

5   alcohol or any other reason?

6        A    No.

7        Q    And you're physically comfortable?

8        A    I'm a little hot, but yes, other than that I'm

9   okay.

10       Q    That won't affect your testimony here today?

11       MS. CRISTOL-DEMAN:  It might affect me, but I've asked

12  them to turn down the air.

13  BY MR. FENSTERMACHER:

14       Q    We covered very briefly yesterday, but at some

15  point obviously you became involved in attempts by

16  Southwest Key to open a new facility or shelter for what

17  we've termed a UACs or UMs in the City of Escondido; is

18  that right?

19       A    Yes.

20       Q    Was it Ismael Avilez that first brought you

21  Escondido to put that on your radar, do you recall?

22       A    It was either Ismael or Shane Harmon.

23       Q    Regardless of who, which of those individuals

24  brought the idea to your attention?  Is it your

25  understanding that it was Mr. Harmon that identified the

**LINDA RYAN REPORTING (714) 202-5853**

Exhibit 3
Page 103

1    Escondido motel sites to bring that city on Southwest

2    Key's radar?

3        A    Yes, sir.

4        Q    Was it your understanding -- when I refer to the

5    motel sites, like we said yesterday, we're talking about

6    Mt. Vernon, Quality Inn and Howard Johnson?

7        A    Yes.

8        Q    Was it your understanding that Mr. Harmon

9    identified those motel sites because the City of

10   Escondido, in his view, had a more permissive zoning

11   ordinance than, say, other cities in San Diego County?

12       A    Yes, sir.

13       Q    And specifically, residential care facilities

14   were permitted by right in a commercial zone?

15       A    Yes, sir.

16       Q    Which was not typical of other cities in the

17   area?

18       A    That was my understanding.

19       Q    So, in other words, Mr. Harmon identified these

20   motel sites because in his view and then in Southwest

21   Key's view it was an option that Southwest Key could

22   potentially open quickly?

23       A    Yes, sir.

24       Q    Because typically Southwest Key is not in the

25   business of applying for discretionary permits; is that

298

Exhibit 3
Page 104

```
 1   permit, but what I can testify to is that it was a very
 2   easy process.
 3   BY MR. FENSTERMACHER:
 4       Q    Were you involved in any discussions with the
 5   City of El Cajon about how to classify Southwest Key's
 6   use?
 7       A    No, sir, because we first opened up our program
 8   in El Cajon over 15 years ago.  And so --
 9       Q    It's whatever that --
10       A    Whatever that was.
11       Q    The same classification?
12       A    Yes.
13       Q    So you don't know, as you sit here today, what
14   that classification was?
15       A    No, sir, I don't.
16       Q    Does transient housing ring a bell?
17       A    It doesn't.
18       MR. FENSTERMACHER:  Mark this as Exhibit 32.
19           (Defendant's Exhibit 32 was marked and
20       is attached hereto.)
21   BY MR. FENSTERMACHER:
22       Q    The court reporter is handing you 32, Bates
23   stamped SWK 20213.  It looks like the chain starts here
24   with an email from you on March 5th to Mr. Harmon.  Do you
25   see that?
```

Exhibit 3
Page 105

1      A    I do.

2      Q    If you take a quick look at this email, it looks

3  like you're talking about telling the city about how many

4  beds Southwest Key is looking for; is that right?

5      A    Yes.

6      Q    In your second sentence you say:

7           "However, don't want to scare the city

8      by giving them a big number."

9      A    Right.

10     Q    Do you recall at some point being concerned about

11 telling the city you were going to add too many beds and

12 that might scare them off?

13     A    What I recollect is that they seemed to be --

14 they were not in support of this already, at whatever

15 point we were in, and what I recollect is I'm trying to

16 phrase this sort of the right way or the way that I need

17 to say it.  Well, I mean we didn't want to scare them by

18 saying we're going to have all of these kids because

19 already they were at this point in time opposed --

20 seemingly opposed to us having any kids.  So I wanted to

21 be honest with them, and I said we need to be honest, but

22 I don't want it to be overwhelming.

23     Q    Understood.  So at this point, the March 5th

24 email, you certainly -- you personally had a feeling that

25 the city was opposed to the project?

Exhibit 3
Page 106

1      A    Yes, at this point.

2      Q    And at this point, as of March 5th, 2014, is it

3  true that at a maximum Southwest Key was looking for 180

4  or 190 beds in the city as opposed to 400 that we talked

5  about earlier?

6      A    I don't remember if Del Diablo was already an

7  option at this point.  So what I remember is things

8  materialized over the spring.  Originally it was

9  Mt. Vernon and Quality Inn or both or one or the other.

10  And then at some point Howard Johnson came into the

11  picture, which would have added approximately another 100

12  beds.  And at some point Del Diablo came into the picture,

13  at which point, I don't know -- I know we started off

14  originally with Mt. Vernon and Quality Inn as the two

15  sites we were looking at.

16      Q    But if you take a look at Mr. Harmon's email just

17  below yours he says:

18          "Great answers.  My only concern with one

19      of the answers is we may have one major

20      facility (two different leases on adjacent

21      properties) making a 180-190 bed facility."

22          Would you understand him to be referring to the

23  Howard Johnson and Quality Inn combined?

24      A    That is.

25      Q    So at least at this point, since, again, you said

1   you were being honest with the city, it looked like that

2   if you had opened that combined facility, that would have

3   been it as far as the beds in Escondido?

4        A    I don't know.

5        Q    Is it a fair statement that -- well, let's go

6   back to -- all the way back here in this packet to page

7   20216.

8        A    Okay.  16, is that what you said?

9        Q    20216.  So here there was a reference to "Great

10  answers" I just talked about for Mr. Harmon, and it looks

11  like here the answers that he is talking about are these

12  answers to questions that were asked by city staff.  Do

13  you see that?

14       A    Yes, sir.

15       Q    It looks like -- this is an email from Bill

16  Martin, but it appears that someone has sort of typed in

17  that same email answers to his questions.

18       A    That looks like what happened, yes.

19       Q    Probably in a different color, but we just can't

20  see it.

21       A    You can't see it.

22       Q    And then after someone took a cut at drafting

23  these answers, it looks like you did if we look at 20215.

24       A    Okay.

25       Q    You forward those answers to Mr. Ferguson and

1  Mr. Harmon for their comment?

2       A    Yes, it looks like that, yes, right.

3       Q    At this point you had the feeling that perhaps

4  the city was not very receptive to Southwest Key's use?

5       A    That's correct.  Because what should have been a

6  very simple process became immediately complicated from

7  the beginning.

8       Q    Is it fair to say at this point on you were

9  fairly careful with the information that you provided the

10 city?

11      MS. CRISTOL-DEMAN:  I'm going to object to the

12 question as vague and ambiguous.

13      THE WITNESS:  I wouldn't characterize it as careful.

14 We wanted to be transparent, but we also wanted to be

15 accurate.

16 BY MR. FENSTERMACHER:

17      Q    But I suppose, as you said in your very first

18 email, you're trying to strike a balance between being

19 honest and not scaring the city and phrasing your answers

20 in a way that, while honest, are going to put Southwest

21 Key's facilities in the best light; is that right?

22      MS. CRISTOL-DEMAN:  Objection.  Compound and complex.

23      THE WITNESS:  I would say we didn't want to overwhelm

24 the city.

25      MR. FENSTERMACHER:  Okay.

Exhibit 3
Page 109

1    Q    When you forwarded your answers to Mr. Ferguson

2    and Mr. Harmon, was there anything in particular that you

3    were looking for them to provide other than just their

4    general advice?

5    A    Well, he was our attorney, and I wanted him -- he

6    was part of the process.

7    Q    We looked a little bit earlier at 30, which was

8    the business license.

9    A    Yes, sir.

10   Q    Without knowing which motel site that is for, I'd

11   represent it is the Mt. Vernon, but it doesn't really

12   matter.  Let's say in February, late February of 2014 or

13   early March, Southwest Key submitted a business license

14   application for a motel site.  And it was submitted at the

15   counter and approved within a matter of days.

16   A    If it had been approved, is that what you're

17   saying?

18   Q    Let's assume for this hypothetical it had been

19   approved in just a matter of days.  Do you know how

20   quickly -- well, let's take Mt. Vernon -- Southwest Key

21   could have become operational?

22   A    So my recollection is that Mt. Vernon needed more

23   remodeling.  It needed a commercial kitchen.  It did not

24   have the attached restaurant -- it actually did, but the

25   restaurant -- that restaurant did not want to lease to us,

Exhibit 3
Page 110

1  know.

2      Q    And Mr. Ferguson specifically was hired, I

3  assume, because of his relationships with the city and

4  experience in the city?

5      A    Right.  And he is a land use attorney in

6  Escondido.  We specifically wanted someone in Escondido,

7  not in San Diego or Vista or Encinitas.

8      Q    Understood.

9      MR. FENSTERMACHER:  I'm going to mark an exhibit here

10  as Exhibit 36.

11          (Defendant's Exhibit 36 was marked and

12      is attached hereto.)

13  BY MR. FENSTERMACHER:

14      Q    Just staying on our discussion about maybe the

15  differences in your use of "shelter" versus the city's.

16      A    Okay.

17      Q    This is an email from Mr. Avilez to you and

18  Mr. Harmon and Mr. Ferguson.  It looks like it's on

19  April 10th.  So it's after -- after the email we just

20  looked at.

21      A    Okay.

22      Q    It looks like the "Subject" line is "Appeal

23  Letter."  So I assume that would refer to Southwest Key's

24  appeal of the shelter determination?

25      A    Can you point out, I'm sorry, where are you

1    talking about?

2         Q    In the "Subject" line.

3         A    Yes, I would imagine that's what it is

4    referencing.

5         Q    That would be fairly consistent with the early

6    April time period by your recollection?

7         A    That's right.

8         Q    So Ismael is kind of talking about his opinions

9    between the difference between a shelter and residential

10   care facility.  And, again, a residential care facility is

11   the use that -- use category that Southwest Key was

12   advocating that the city should determine its use to be?

13        A    Correct, because that's what we're licensed as.

14        Q    And that's the use that is permitted by right, at

15   least at that time, in the commercial zone --

16        A    Correct.

17        Q    -- at the motel sites?

18             So here Mr. Avilez says:

19             "A shelter is a voluntary program,

20        (Run away Shelter, Homeless Shelter, Domestic

21        Violence Shelter) while a residential care

22        facility is a program where there is a direct

23        placement from a specific agency that has

24        the custodial responsibility of the client.

25        In our case ORR makes the initial placement

347

Exhibit 3
Page 112

 1          of the minors while in other group homes it

 2          may be probation or Child Protective Services."

 3               Would you agree, in general, with the distinction

 4     he is drawing here between, say, homeless shelters versus

 5     the type of shelter that Southwest Key runs?

 6          MS. CRISTOL-DEMAN:  Objection.  That may call for a

 7     legal conclusion.

 8          THE WITNESS:  I would agree with that.

 9     BY MR. FENSTERMACHER:

10          Q     And what he is saying is sort of voluntary versus

11     involuntary program, if I'm going to oversimplify it; is

12     that right?

13          A     That's correct.

14          Q     Because, again, a homeless person, if a

15     homeless -- if a typical homeless transient person left a

16     shelter, no one would call the police or try to go find

17     them?

18          A     That's correct.

19          Q     Which, again, is not the case in Southwest Key's

20     facilities?

21          A     Correct.

22          Q     And when a minor is apprehended by border patrol

23     or ICE or whoever in the federal government apprehends

24     them, they don't at any point say "I'd like to go stay at

25     Southwest Key's facility," right?

Exhibit 3
Page 113

1       A    No, they don't.

2       Q    Even if they did, it wouldn't matter?

3       A    That's correct.

4       Q    And once they're placed, would a minor be able to

5    say, "I'd really prefer El Cajon because I like the area

6    versus Texas"?

7       A    Could the minor say that?

8       Q    Right.

9       A    I think the minor could say what they want to

10   say.

11      Q    Would it matter?

12      A    It wouldn't matter.  They wouldn't even know.

13      Q    Right.  I understand that in most cases a minor

14   from a different country would probably not know the

15   difference between the cities, of course?

16      A    Right.

17      Q    But in the instance where a minor had a

18   preference on the city that minor wanted to reside in

19   temporarily in at a Southwest Key facility, that wouldn't

20   be taken into account for placement?

21      A    No, sir.

22      Q    Because ultimately ORR makes that decision?

23      A    ORR and Washington, D. C.  Their intakes make

24   that decision.

25      Q    And they're just involuntarily placed at one of

349

Exhibit 3
Page 114

1  yours or a competitor's facility?

2      A    That is correct, and I don't know how that

3  process -- their intake process works, but they make those

4  decisions.

5      Q    One of the mysteries of the federal government?

6      A    It is a giant mystery of which I would like to

7  uncover.

8      Q    Okay.  Again, I know you said that you looked in

9  the M-1 or shelter overlay zone and didn't see any

10  available facilities.  But you did understand, you

11  personally and everyone at Southwest Key that you're aware

12  of, that the shelter determination did not necessarily

13  foreclose the possibility that Southwest Key could open a

14  shelter in the City of Escondido?

15      A    The shelter?  Can you read that back?

16      Q    I'll rephrase.

17          For example, had the city determined -- was it

18  your understanding that if the city determined that

19  Southwest Key's facilities were, say, an orphanage or a

20  detention center, they wouldn't have been permitted

21  anywhere in the city?

22      A    So what I can say is that there were a couple of

23  those classifications, I don't remember which, that were

24  not permitted in the city.  At one point we got one of

25  those classifications, but I don't remember which one it

350

Exhibit 3
Page 115

1  STATE OF _____)
                                  )  ss.
2  COUNTY OF _____)

3

4

5

6

7

8

9      I, the undersigned, say that I have read the foregoing

10  deposition, and I declare, under penalty of perjury under

11  the laws of the State of California, that the foregoing is

12  a true and correct transcript of my testimony contained

13  therein.

14      EXECUTED this _____ day of _____,

15  2016, at _____.

16

17

18      _____
        ALEXIA RODRIGUEZ
19      Volume 2 - Personal Deposition

20

21

22

23

24

25

525

Exhibit 3
Page 116

1

2

3      I, the undersigned, a Certified Shorthand Reporter of

4   the State of California, do hereby certify:

5      That the foregoing proceedings were taken before me at

6   the time and place herein set forth; that any witnesses in

7   the foregoing proceedings, prior to testifying, were

8   placed under oath; that a verbatim record of the

9   proceedings was made by me using machine shorthand which

10  was thereafter transcribed under my direction; further,

11  that the foregoing is an accurate transcription thereof.

12     I further certify that I am neither financially

13  interested in the action nor a relative or employee of any

14  attorney of any of the parties.

15     IN WITNESS WHEREOF, I have this date subscribed my

16  name.

17

18  Dated: _____ 7/16/16 _____

19

20

21  _____

    LINDA SILVER RYAN

22  CSR No. 9915

23

24

25

526

Exhibit 3
Page 117